UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
_____

In re:

MOISE BANAYAN,                                              Chapter 7
                                                           Case No.: 08-60954

                                    *Debtor.*
_____

In re:

SIGNATURE BANK,                                            Adv. Pro. No.: 08-80042

                                    *Plaintiff,*

v.

MOISE BANAYAN,

                                    *Defendant.*
_____

In re:

SIGNATURE BANK,                                            Adv. Pro. No.: 08-80073

                                    *Plaintiff,*

v.

MOISE BANAYAN,

                                    *Defendant.*
_____

APPEARANCES:

HERRICK, FEINSTEIN LLP                         GARY F. EISENBERG, ESQ.
*Attorneys for Plaintiff*
2 Park Avenue
New York, New York 10016

COHEN TAUBER SPIEVACK & WAGNER P.C.            SARI E. KOLATCH, ESQ.
*Former Attorneys for Debtor-Defendant*[1]     LEO ESSES, ESQ.

---

[1] By Order of this Court issued on March 17, 2011, and docketed in Adversary Proceeding Number 08-80073
("Adversary Proceeding 2"), Cohen Tauber Spievack & Wagner P.C. ("CTSW") was permitted to immediately
withdraw as counsel of record for Debtor-Defendant Moise Banayan ("Debtor" or "Defendant").  Adv. Pro. 2, ECF

420 Lexington Avenue, Suite 2400
New York, New York 10170

MOISE BANAYAN
*Pro Se Debtor-Defendant*
51 Parker Boulevard
Monsey, New York 10952-1449

Honorable Diane Davis, United States Bankruptcy Judge

## MEMORANDUM-DECISION AND ORDER

Before the Court are separate adversary proceedings initiated by Plaintiff Signature Bank

("Signature" or "Plaintiff") against Debtor seeking a denial of Debtor's discharge pursuant to

section 727(a)[2] of the United States Bankruptcy Code[3] and to except from Debtor's discharge a

pre-petition judgment debt (the "Debt") owed by Debtor to Signature in the approximate amount

of $11,587,220.62 pursuant to § 523(a).[4]   These actions arise out of a commercial banking

relationship between the parties that commenced in 2005 and slowly unwound beginning in

2007, culminating in a state court judgment[5] and ultimately the present litigation before this

Court.   On consent of the parties, Signature's adversary proceedings were consolidated for

purposes of trial and decision.[6]   The consolidated trial in these matters spanned two and a half

days, and after consideration of the arguments of counsel, the documentary and testamentary

evidence presented, and post-trial memoranda of law, this Court makes the following findings of

---

No. 84.  Because CTSW represented Debtor through the point of post-trial submissions in Adversary Proceeding
Number 08-80042 ("Adversary Proceeding 1") and Adversary Proceeding 2, their appearance is included for
purposes of this Memorandum-Decision and Order.
[2] *See* Compl. to Deny Discharge of Debtor Pursuant to Section 727(a) of the Code, Dec. 12, 2008 (the "Discharge
Complaint"), Adv. Pro. 2, ECF No. 1.
[3] Unless otherwise indicated, subsequent chapter and section references are to the United States Bankruptcy Code
(the "Bankruptcy Code"), 11 U.S.C. §§ 101–1534 (2010).
[4] *See* Compl. to Except Debt from Discharge Pursuant to Section 523(a) of the Bankruptcy Code (the
"Dischargeability Complaint"), July 18, 2008, Adv. Pro. 1, ECF No. 1.
[5] *See* Plaintiff's secured Proof of Claim, Claim Number 14, filed in Debtor's main bankruptcy case, Chapter 7 Case
Number 08-60954 (the "Main Case"), on July 9, 2008, itemizing the judgment rendered in the amount of
$9,453,364.97, plus accrued interest, late charges, legal fees, costs, and expenses.
[6] *See* Consent Order Vacating Default and Consolidating Signature Bank's Actions Against the Debtor, June 2,
2009, Adv. Pro. 1, ECF No. 8 and Adv. Pro. 2, ECF No. 11.

fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable here

by Federal Rule of Bankruptcy Procedure 7052.  For the reasons set forth herein, Signature's

Discharge and Dischargeability Complaints are dismissed.

## I.    JURISDICTION

This Court has jurisdiction over the parties and subject matter of these adversary

proceedings pursuant to 28 U.S.C. §§ 1334(a) and 157(a) and (b).  These are core proceedings

which this Court may hear and determine pursuant to 28 U.S.C. §§ 157(b)(2)(I) and (J).

## II.    PROCEDURAL HISTORY[7]

### A.    The Main Case

On April 25, 2008, Debtor filed a voluntary petition for bankruptcy relief under Chapter

11 of the Bankruptcy Code.[8]  Signature moved immediately thereafter for appointment of a

trustee pursuant to § 1104[9] and for stay relief pursuant to § 362(d).[10]  Debtor, through his former

counsel, filed opposition to both motions.[11]  Prior to adjudication of its first § 362(d) motion,

Signature filed a second § 362(d) motion (the "Second § 362(d) Motion"),[12] which Debtor did

not directly oppose.  Rather, Debtor voluntarily moved pursuant to § 1112(a) to convert his case

---

[7] The parties to this Memorandum-Decision and Order have engaged in extensive motion practice, much of which was presided over by the undersigned's predecessor, Retired Chief Judge Stephen D. Gerling.  Accordingly, the Court assumes familiarity with all prior rulings and orders issued in the Main Case, Adversary Proceeding 1, and Adversary Proceeding 2.

[8] Voluntary Pet., Main Case, ECF No. 1.

[9] Verified Mot. of Signature Bank for an Order Appointing a Chapter 11 Trustee for the Estate of Moise Banayan Pursuant to § 1104(a) and to Compel Surrender of Debtor's Passport, Apr. 29, 2008, Main Case, ECF No. 12; Decl. of Gary Eisenberg, Apr. 29, 2008, Main Case, ECF No. 14.

[10] Mot. of Signature Bank for an Order Granting Relief from the Automatic Stay, May 2, 2008, Main Case, ECF No. 17; Decl. of Gary Eisenberg, May 2, 2008, Main Case, ECF No. 19; Decl. of Robert Bloch, May 2, 2008, Main Case, ECF No. 20.

[11] Answering Aff. of David P. Antonucci, Esq., May 16, 2008, Main Case, ECF No. 37; Answering Aff. of David P. Antonucci, Esq., June 5, 2008, Main Case, ECF No. 51.

[12] Mot. of Signature Bank for an Order Granting Relief from the Automatic Stay, June 26, 2008, Main Case, ECF No. 72; Decl. of Steven A. Munson, June 26, 2008, Main Case, ECF No. 74.  *See also* Notice of Partial Withdrawal of Mot. of Signature Bank for an Order Granting Relief from the Automatic Stay, July 14, 2008, Main Case, ECF No. 92.

from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code,[13] which this Court

granted by Order issued August 12, 2008.[14]

After a hearing held on Signature's Second § 362(d) Motion on September 16, 2008, this

Court granted stay relief permitting Signature to foreclose on certain parcels of real property

owned by Debtor.[15]  On December 29, 2008, Christian H. Dribusch, Esq., appointed Chapter 7

trustee of Debtor's estate ("Trustee"), moved pursuant to Federal Rule of Bankruptcy Procedure

9019(a) to settle certain third party claims held by the estate and to sell the estate's interest in

certain assets to Signature for $25,000.00 (the "9019 Motion").[16]  By Order issued February 20,

2009, this Court granted the 9019 Motion.[17]  Through the post-petition sale of certain assets,

Signature was able to realize approximately $1,000,000.00, thereby reducing the Debt at issue.

Debtor does not dispute that Signature is owed the amount claimed and in fact listed Signature

on Schedule D of his petition as a secured creditor holding a claim in the amount of

$11,000,000.00.[18]

### B.    Adversary Proceedings 1 and 2

On May 25, 2008, the Court issued a Second Amended Scheduling Order.[19]   In

accordance with the Court's directives therein, the parties timely submitted pre-trial statements

and exhibit lists.[20]  Also as required by the Second Amended Scheduling Order, the parties filed

---

[13] Untitled Affirmation of David P. Antonucci, Esq., July 17, 2008, Main Case, ECF No. 95.
[14] Order Converting Chapter 11 Case to a Case Under Chapter 7 and Directing Debtor to Comply with Bankruptcy Rule 1019, Main Case, ECF No. 119.
[15] Order Granting Relief from Automatic Stay, Oct. 27, 2008, Main Case, ECF No. 150.
[16] Am. Mot. to Settle and Sell Property of the Bankruptcy Estate, Main Case, ECF Nos. 164.
[17] Order Pursuant to Bankruptcy Rule 9019 Authorizing and Approving Asset Sale Agreement, Main Case, ECF No. 177.
[18] Voluntary Pet., Schedule D.
[19] Second Am. Scheduling Order, Adv. Pro. 2, ECF No. 48.
[20] Pl.'s Pre-Trial Statement, Oct. 8, 2010, Adv. Pro. 2, ECF No. 52; Pl.'s Trial Ex. Index, Oct. 8, 2010, Adv. Pro. 2, ECF No. 54; Pl.'s Am. Trial Ex. Index, Oct. 11, 2010, Adv. Pro. 2, ECF No. 58; Pl.'s Second Am. Trial Ex. Index, Oct. 14, 2010, Adv. Pro. 2, ECF No. 60; Def.'s Pretrial Statement, Oct. 8, 2010, Adv. Pro. 2, ECF No. 55; and Def.'s Exs., Oct. 8, 2010, Adv. Pro. 2, ECF No. 59.

written objections to each other's proposed exhibits and witnesses,[21] and a Joint Stipulation of Facts.[22]  The consolidated trial took place on October 19, 2010,[23] November 29, 2010,[24] and November 30, 2010.[25]   As an initial matter, the Court heard and ruled upon the parties' numerous evidentiary objections, with the exception of a select few, which were taken under advisement.[26]  At the conclusion of trial, Debtor moved to dismiss Signature's complaints in their entirety based upon Signature's alleged failure to prove material elements of its various claims.[27]  The Court advised the parties that the matter would be reserved for decision pending the Court's receipt of post-trial submissions.[28]  The Court directed the parties to simultaneously file post-trial memoranda of law including proposed findings of fact and conclusions of law on or before January 21, 2011.  Signature and Debtor each filed post-trial submissions on January 21, 2011.[29]

On March 10, 2011, Signature moved to amend the complaint in Adversary Proceeding 1 to add a § 523(a)(6) cause of action based upon the proof adduced at trial.[30]  Debtor filed written

---

[21] Objections of Pl. Signature Bank to Def.'s Ex. List, Oct. 14, 2010, Adv. Pro. 2, ECF No. 59; Def.'s Objections to Pl.'s Trial Exs., Oct. 14, 2010, Adv. Pro. 2, ECF No. 61.

[22] Joint Stipulation of Facts, Oct. 8, 2010, Adv. Pro. 2, ECF No. 53.

[23] The transcript of the first day of trial was docketed on November 8, 2010, and will be referred to herein as "Tr. 1." Adv. Pro. 2, ECF No. 63.

[24] The transcript of the second day of trial was docketed on December 10, 2010, and will be referred to herein as "Tr. 2."  Adv. Pro. 2, ECF No. 66.

[25] The transcript of the third and final day of trial was also docketed on December 10, 2010, and will be referred to herein as "Tr. 3."  Adv. Pro. 2, ECF No. 68.

[26] See Tr. 1 4–49.  The Court's oral rulings are incorporated herein without further discussion.  Upon a review of the trial transcript and the parties' post-trial memoranda, the Court declines to rule on the outstanding preliminary evidentiary objections as the subject exhibits were neither offered during trial nor relied upon by the parties in their post-trial submissions.

[27] Tr. 3 165–167.

[28] Tr. 3 167.

[29] Pl. Signature Bank's Proposed Findings of Fact and Conclusions of Law ("Plaintiff's Memorandum"), Adv. Pro. 2, ECF No. 71; Moise Banayan's Post-Trial Memorandum ("Debtor's Memorandum"), Adv. Pro. 2, ECF No. 72.

[30] Mot. by Signature Bank Pursuant to Bankruptcy Rule 7015 and Fed.R.Civ.Proc. 15(b) to Amend Compl. to Plead Relief Under Section 523(a)(6) of Code as Tried to Court ("Plaintiff's Rule 15(b) Motion"), Adv. Pro. 1, ECF No. 11.

opposition to Signature's motion on March 10, 2011,[31] and the Court heard oral argument on this limited matter on March 15, 2011.  By Order issued on March 17, 2011, the Court denied Plaintiff's Rule 15(b) Motion.[32]  On July 25, 2011, Signature moved to supplement the trial record with respect to its § 523(a)(2)(A) claim based upon newly discovered evidence unearthed in connection with a lawsuit by one of Debtor's former lenders against Signature over the relative priority of their respective security interests and rights to collateral proceeds.[33]  Debtor also opposed this post-trial motion.[34]  Following a hearing on August 16, 2011, the Court issued an order denying Plaintiff's Rule 59(a) Motion.[35]  Adversary Proceedings 1 and 2, therefore, were ripe for decision as of August 18, 2011.

### III.    SIGNATURE'S ABANDONMENT OF MUTIPLE CLAIMS

The Court here is compelled to depart from its usual format of rendering its conclusions of law after its factual findings because it is apparent from the trial and post-trial record that Signature abandoned seven of the eight claims set forth in its Discharge and Dischargeability Complaints, thereby leaving the Court to decide only one claim under § 523(a)(2)(A).  Signature initially sought relief under § 523(a)(2)(A), (a)(2)(B), (a)(4), and 727(a)(2)(A), (a)(2)(B), (a)(4)(A), (a)(5), and (a)(7).  Plaintiff's Memorandum, however, presents proposed conclusions of law only with respect to § 523(a)(2)(A) and (a)(6).[36]  Plaintiff did not therein argue, or even reference, any of the other original claims asserted.

---

[31] Moise Banayan's Mem. of Law in Opp'n to Signature Bank's Mot. to Amend Compl. to Plead Relief Under Section 523(a)(6) of the Code, Adv. Pro. 1, ECF No. 16.
[32] Order Denying Mot. to Amend Compl., Adv. Pro. 1, ECF No. 17.
[33] Mot. by Signature Bank Pursuant to Bankruptcy Rules 9023, 9024, and Fed.R.Civ.Proc. 59(a) and 60(b) to Supplement Record in Adversary Proceeding ("Plaintiff's Rule 59(a) Motion"), Adv. Pro. 1, ECF No. 19; Decl. of Robert Bloch., Adv. Pro. 1, ECF No. 20.
[34] Debtor's Untitled Opp'n, Adv. Pro. 1, ECF No. 23.
[35] Order Denying Mot. by Signature Bank Pursuant to Bankruptcy Rules 9023 and 9024 and Fed.R.Civ.P. 59(a) and 60(b) to Supplement Record in Adversary Proceeding, Aug. 18, 2011,  Adv. Pro. 1, ECF No. 25.
[36] Pl.'s Mem. at 35–52.

Because the plaintiff bears a heavy burden of proof in discharge and dischargeability litigation, this Court agrees with the line of cases holding that a plaintiff's failure to argue the applicability of certain causes of action in a post-trial brief may result in the abandonment of such claims and, hence, their removal from the court's consideration.[37]  In this case, following a lengthy trial that included approximately a day and a half of testimony from Debtor, Signature has neither submitted proposed conclusions of law nor set forth specific elements and corresponding offers of proof with respect to any claims other than § 523(a)(2)(A).  Signature did make passing references to the existence of its § 523(a)(4) claim in its Rule 15(b) Motion,[38] but those references were followed by Signature's concession that the evidence it has submitted may not establish embezzlement under § 523(a)(4).[39]  Under the circumstances, the Court concludes that Signature has abandoned all claims for relief other than § 523(a)(2)(A) and, hence, the Court's consideration is now limited to the same.

## IV.    FACTUAL FINDINGS[40]

As is typical in many cases brought under § 523(a)(2)(A), the parties in the present case focused on two elements: (1) whether Debtor acted with the requisite intent to deceive Signature; and (2) whether Signature actually relied upon false representations made by Debtor.  The Court has given careful consideration to each party's respective proposed findings of fact and conclusions of law, which for obvious reasons portray markedly differing accounts of their dealings with one another.  With these two key elements in mind, the Court, drawing from the evidence presented at trial, the demeanor of the witnesses, and the complete record developed by

---

[37] *In re Henderson*, 134 B.R. 147, 155 (Bankr. E.D. Pa. 1991) (citing cases); *see also, e.g., Strong v. Option One Mortgage Corp. (In re Strong)*, 356 B.R. 121, 136–37 (Bankr. E.D. Pa. 2004) (collecting cases) (the failure of a party to address issues in a post-trial submission may constitute a waiver of those issues).

[38] Pl.'s Rule 15(b) Mot. at 7, 9.

[39] Pl.'s Rule 15(b) Mot. at 10.

[40] Much of the testimony elicited in this litigation with respect to certain facts was conflicting.   To the extent necessary, the findings of fact rendered herein reflect the Court's determination of the credibility of the witnesses.

the parties in the Main Case and in connection with this litigation, makes the following findings

of fact.

### A.    Debtor's Background

1.      Debtor is an individual debtor residing in the state of New York, having an address at 51 Parker Boulevard, Monsey, New York.[41]

2.      Debtor holds an MBA from the University of British Columbia in finance, organizational behavior, and international finance.  He has held various positions during his career as a consultant for the Canadian government, hotel entrepreneur, banker, and, for the past twenty years, owner of a multi-corporation Cholov Yisroel kosher dairy business.[42]

3.      Debtor testified that the Cholov Yisroel kosher dairy business requires constant rabbinic supervision during the milking process of kosher cows and adherence to strict kosher laws at all times during farming operations.[43]  In order to obtain raw materials for kosher dairy products, Debtor contracted with kosher farms in upstate New York.[44]

4.      Debtor started the business in 1983 under the name of Ahava Dairy Product Corporation ("Ahava Dairy"), which was a distributor of dairy products until approximately 2000 or 2001.[45]

5.      On October 27, 1999, Debtor formed Ahava Food Corporation ("AFC"), a New York corporation, which had its principal place of business at a large industrial facility located at 110 Beard Street, Brooklyn, New York ("110 Beard").[46]  Debtor started AFC and purchased 110 Beard with funding from the New York City Industrial Development Agency ("IDA") under an Empire State Development grant aimed at manufacturing and building development.  At that

---

[41] Joint Stipulation of Facts ¶ 2.
[42] Tr. 2 269, 271–72.
[43] Tr. 2 270–71.
[44] Tr. 2 275.
[45] Tr. 2 271–72.
[46] Joint Stipulation ¶ 3.

time, AFC received approximately $10,000,000.00 in grant monies as a manufacturer and distributor of dairy, juices, turkey imports, canned items, and other kosher products.[47]

6.    Debtor testified that in the formative years of the business, there were two manufacturing facilities. 110 Beard housed a cheese aging and manufacturing operation and, in 1996, Debtor formed Lewis County Dairy Corporation ("LCD"),[48] a New York corporation, which had its principal place of business at 7705 State Route 812, Lowville, New York (the "Lowville Facility").[49] The Lowville Facility was initially used only to bottle milk and make yogurt. By 2001, however, all manufacturing had been moved to the Lowville Facility.[50] After 2001 or 2002, LCD was operating as a nonprofit manufacturing corporation that sold its products at cost exclusively to AFC, which in turn profited upon distribution.[51]

7.    On April 5, 2000, Debtor formed Yoni Realty, LLC ("Yoni"), a New York limited liability company, which had its principal place of business at 110 Beard.[52]

8.    On March 8, 2000, Debtor's brother, Fariborz Banayan ("Fariborz"), formed Ahava of California ("AOC"), a limited liability company with its principal place of business at 908 Rose Avenue, Venice, California.[53] AOC operated a kosher distributorship. Debtor testified that at the time of formation, his brother was the managing member and he held a fifty percent membership interest. According to Debtor, AOC became a "major" sub-distributor of AFC.[54]

9.    In 2004, Debtor formed St. Lawrence Food Corporation ("SLF"), a New York corporation, which had its principal place of business at 30 Main Street, Ogdensburg, New York

---

[47] Tr. 2 273.
[48] Tr. 2 273–75.
[49] Joint Stipulation ¶ 6.
[50] Tr. 2 275.
[51] Tr. 2 276.
[52] Joint Stipulation ¶ 4.
[53] Joint Stipulation ¶ 20.
[54] Tr. 2 277–79.

(the "Ogdensburg Facility").[55]  Debtor purchased the Ogdensburg Facility through a bankruptcy sale and began using the cheese plant to manufacture hard cheeses and whey protein concentrate.[56]  SLF was also operating as a nonprofit manufacturing corporation that sold its products at cost exclusively to AFC, which in turn profited upon distribution.[57]

10.    Prior to 2005, Debtor financed AFC, LCD, and SLF (collectively, the "Ahava Companies") through various lenders, including Commerce, Merrill Lynch, and Rochester Funding.[58]

## B.    The Signature Loan

11.    Robert Bloch ("Bloch"), Signature's main witness, holds a BA in economics from Cornell University.  He joined Chemical Bank in 1987, where he completed management and credit training and eventually held positions as a credit analyst and relationship manager in the middle market banking group.  He joined Fleet Bank ("Fleet") in 1996 as a relationship manager in the mid-corporate banking group.  While at Fleet, he was promoted to team leader of a middle market banking group and he ultimately ran a corporate banking group in Manhattan.  In 2004, Bloch joined Signature as a Group Director and Senior Vice President.  In this role, Bloch is responsible for building Signature's clientele and managing those relationships.[59]

12.    Bloch testified that he first met Debtor between 2000 and 2002 when he was working for Fleet.  He toured 110 Beard while Fleet was considering Debtor as a potential client.[60]  He was reintroduced to Debtor in 2005 by a loan broker and through Signature put

---

[55] Joint Stipulation ¶ 7.
[56] Tr. 2 276.
[57] Tr. 2 277.
[58] Tr. 2 277.
[59] Tr. 1 84–86.
[60] Tr. 1 87.

together a financing package to refinance the existing working capital bank, which was Merrill-Lynch.[61]

13.    During 2005 loan negotiations between Debtor and Signature, Debtor represented AFC and Bloch was the point person on behalf of Signature.[62]

14.    On or about August 22, 2005, Signature entered into a Master Credit Facility Agreement and various loan documents (collectively, the "Credit Agreement") with Debtor, the Ahava Companies, and Yoni (collectively, the "Obligors").[63]    Pursuant to the Credit Agreement, Signature made a secured loan to AFC in order to provide operating capital in the amount of $7,500,000.00 (the "Loan").    The Loan was comprised of a term loan in the amount of $2,000,000.00 ("Facility A") and a working capital revolving credit in the amount of $5,500,000.00 ("Facility B").    Pursuant to the Credit Agreement, the Ahava Companies were scheduled to make both a monthly payment on Facility A and a monthly interest only payment on Facility B.

15.    Debtor testified that the Credit Agreement was prepared in its entirety by Signature's attorneys based on information provided by Debtor and obtained by Signature during the course of its due diligence.[64]    Debtor's recollection was that he actually signed the document two to three weeks prior to the closing date of the Loan.[65]

16.    The Credit Agreement contained numerous representations and warranties made by the Obligors.    These representations and warranties were set forth in Section III of the Credit Agreement and included, *inter alia*, that: (1) under Section 3.03 titled "Financial Condition," subparagraph (a), all financial statements furnished by Debtor to Signature in connection with

---

[61] Tr. 1 87.
[62] Tr. 1 87–88; Tr. 2 281.
[63] Pl.'s Ex. 55.
[64] Tr. 3 15–17.
[65] Tr. 3 17.

the Loan "present fairly and accurately the financial condition of such Obligor as of the dates of the financial statements, and between the date of said statements and the date hereof, no material adverse change in the financial condition, the business or the operations of any of the Obligors has occurred;" (2) under Section 3.03, subparagraph (b), "[t]here is no obligation or liability, contingent or otherwise of any of the Obligors which is material in amount and which is not reflected in the financial statements" rendered; (3) under Section 3.05 titled "Title to Properties," "[e]ach of the Obligors have good and valid title to the properties and assets reflected on the financial statements referred to in Section 3.03(a).  All such properties and assets are free and clear of mortgages, pledges, liens, charges and other encumbrances . . . ;" (4) under Section 3.06 titled "Litigation," "[o]ther than as provided herein, there are no actions, suits or proceedings . . . which involve any of the transactions contemplated herein or which, if adversely determined against one or more of the Obligors, would result in any materially adverse change in the business, operations, prospects, properties or assets or in the condition, financial or otherwise, of one or more of the Obligors . . . ;" and (5) under Section 3.11 titled "Subsidiaries/Affiliates," " [t]here is no Subsidiary or Affiliate of any Obligor other than as set forth on <u>Schedule 3.11</u>."[66]

17.    The Credit Agreement also contained numerous affirmative covenants made by the Obligors.  These affirmative covenants were set forth in Section V of the Credit Agreement and included, *inter alia*, that each of the Obligors shall: (1) under Section 5.01 titled "Existence, Properties, etc.," subparagraph (a), "[d]o or cause to be done, all things necessary to preserve and keep in full force and effect the existence of each of the Obligors (other than [Debtor]) as a corporation or limited liability company (as applicable);" (2) under Section 5.01, subparagraph (b), "comply with all . . . material contractual obligations;" (3) under Section 5.01, subparagraph (c), "preserve all of its property used or useful in the conduct of its business and keep the same as

---

[66] Pl.'s Ex. 55 (emphasis in original).

required under the Security Agreement and otherwise in good repair, working order and condition . . . ;" and (4) under Section 5.05 titled "Notice of Adverse Change," "[p]romptly notify [Signature] in writing of (a) any change in the business, operations or financial condition of any Obligor . . . , and (b) any information which indicates that any financial statement delivered pursuant to this Agreement, fails, to any material extent, to present fairly the financial condition and results of operation or other information purported to be presented therein, disclosing the nature thereof."[67] Sections 5.06 titled "Notice of Default" and 5.07 titled "Litigation Notice" also required each of the Obligors to provide Signature with written notice of an event of default as defined within the Credit Agreement and with written notice of any action, suit, or proceeding that would, if determined against one or all of them, materially impact the right or ability of any of the Ahava Companies to carry on its respective business substantially as conducted in 2005, respectively.[68]

18.    The Credit Agreement also contained numerous negative covenants made by each of the Obligors.  These negative covenants were set forth in Section VI and included, *inter alia*, that each of the Obligors shall not: (1) under Section 6.02 titled "Sale of Assets, Consolidation, Merger, etc.," "(i) sell, lease transfer or otherwise dispose of any of [their] properties or assets . . . or (iv) create or acquire any Subsidiary or Affiliate" without such subsidiary or affiliate becoming a guarantor of the Loan and obligations imposed by the Credit Agreement; (2) under Section 6.06 titled "Loans and Investments," "lend or advance money, credit or property to any person, or invest in . . . or purchase or repurchase stock, other securities, or partnership interests, other equity or indebtedness;" (3) under Section 6.07 titled "Nature of Business," "[c]hange or alter the nature of its business;" and (4) under Section 6.12 titled "Sale and Leaseback," "[e]nter

---

[67] Pl.'s Ex. 55.
[68] Pl.'s Ex. 55

into any agreement, directly or indirectly, with any Person whereby it shall sell or transfer any property . . . if at the time of such sale or disposition it intends to lease or otherwise acquire the right to use or possess . . . such property or like property for a substantially similar purpose."[69]

19.    On or about August 22, 2005, in connection with the Credit Agreement, the Obligors signed a Joint and Several Guarantee of Payment ("Joint Guarantee") whereby they agreed to be jointly and severally liable for all future and past indebtedness of AFC to Signature.[70]

20.    On or about August 22, 2005, in connection with the Credit Agreement, the Ahava Companies, Yoni and Signature executed a Security Agreement covering all obligations owed by the Ahava Companies and Yoni to Signature.[71]  The Security Agreement granted Signature a first priority security interest in all of the assets of the Ahava Companies, including, *inter alia*, all personal assets, accounts receivable, general intangibles, deposit accounts, securities and investment property.

21.    Signature filed UCC statements with the New York Department of State in 2005.[72]

22.    The Loan was also secured by personal guarantees given by Debtor and his wife, Ana Banayan ("Ana"), on or about August 22, 2005.  Debtor and Ms. Banayan personally guaranteed all of the obligations of the Ahava Companies and Yoni, including the performance of all representations, warranties, and covenants in the Credit Agreement.[73]

---

[69] Pl.'s Ex. 55
[70] Pl.'s Ex. 112.
[71] Pl.'s Ex. 111.
[72] Joint Stipulation ¶ 13.
[73] Pl.'s Ex. 112.

23.    Prior to entering into the Credit Agreement and the related loan documents, Signature conducted extensive due diligence in connection with Debtor and the Ahava Companies,[74] which was paid for by Debtor.[75]

24.    Signature reviewed at least three years of historical financial statements for each of the Ahava Companies,[76] a 2004 financial statement for Yoni,[77] and a Personal Financial Statement of Debtor, dated February 2005 (the "2005 Personal Financial Statement").[78]

25.    Signature also reviewed numerous internal corporate documents of the Ahava Companies and hired an independent third-party to review and test the performance of the Ahava Companies' accounts receivable.[79]    Specifically, Signature focused upon accounts receivable aging and concentration, the latter of which revealed a minimized credit risk as there was no receivable that averaged in excess of $50,000.00 to $70,000.00 at any point in time.[80]    Based on the information provided by Debtor, Signature determined that the Ahava Companies comprised an "integrated business" with both manufacturing and distribution components.[81]    As such, Signature evaluated the Ahava Companies as "a consolidated entity" with consolidated net sales to unrelated third-parties being approximately $24,000,000.00 to $30,000,000.00 annually.[82] Debtor advised Signature that AFC sold its products to several hundred customers, including supermarkets and bodegas, in the metropolitan New York City area and elsewhere on the east coast of the United States.[83]    Signature's own review of documents relating to the Ahava Companies' accounts receivable led Signature to conclude that an eighty percent advance rate

---

[74] Tr. 1 88–99, 103.
[75] Tr. 3 16.
[76] Tr. 1 88–89.
[77] Tr. 1 97.
[78] Tr. 1 92; Pl.'s Ex. 49.
[79] Tr. 1 89; Pl.'s Ex. 55.
[80] Tr. 1 91.
[81] Tr. 1 90.
[82] Tr. 1 91.
[83] Tr. 1 91.

against eligible receivables would be appropriate and that the distribution of receivables was adequate because of the fact that there was no single receivable in excess of $50,000 to $70,000 at any given time.[84]

26.    Signature engaged an independent appraiser to appraise the equipment at 110 Beard, the Lowville Facility, and the Ogdensburg Facility.[85]

27.    Bloch testified that Signature did not appraise 110 Beard because Debtor provided Signature with a relatively current appraisal.  The appraisal valued 110 Beard between $12,000,000.00 and $14,000,000.00.  According to Bloch, after taking into account the outstanding mortgage in the approximate amount of $7,000,000.00 on the property, Signature felt there was equity it could rely on to secure the Loan.[86]  Bloch testified that although Signature perfected and later released a lien on the leasehold improvements to 110 Beard at the request of the IDA in order to allow Debtor to refinance Yoni in 2006 or 2007, Signature maintained a perfected lien on the realty and on the refrigeration and freezer equipment housed at 110 Beard.[87]

28.    Signature also conducted a search of all open UCC filings, a litigation search, and an investigation into pending litigation brought by American Equities Group ("AEG") against Ahava Dairy, AFC, and LCD (the "AEG Defendants").[88]  AEG formerly financed Ahava Dairy in the 1990s before AEG went into bankruptcy.  Debtor testified that Ahava Dairy started doing business with AEG in 1995 and that AFC had never been a party to any factoring or other financing agreement with AEG notwithstanding that AEG eventually named AFC as a co-defendant in the lawsuit.[89]  In or about 2000 or 2001, the bankruptcy trustees for AEG filed an

---

[84] Tr. 1 89–91.
[85] Tr. 1 89.
[86] Tr. 1 90.
[87] Tr. 2 14–15.
[88] Tr. 2 228–30; Tr. 1 98–99.
[89] Tr. 2 201.

$8,000,000.00 claim against Ahava Dairy, AFC, LCD, and Debtor personally, claiming a breach of payments by Ahava Diary under a 1996 factor agreement (the "AEG Litigation"). Debtor testified, however, that he had deposited an amount sufficient to pay off the AEG indebtedness in AEG's bank account, although he was unable to get the AEG Litigation dismissed.[90]

29.    Bloch testified that upon learning of the AEG Litigation through Signature's litigation search, Signature spoke with Debtor and Debtor's counsel at that time, Dennis Stein, Esq., of Stein Riso Mantel, LLP ("SRM"), regarding the merits and status of that lawsuit.[91] Signature was advised by Mr. Stein that the AEG Litigation had been dormant for many years, AEG did not have a lien on any of the assets of the Ahava Companies, and that AEG's claims were without merit. Debtor further advised Signature that there had been fraud internally at AEG and that AEG had lost its records and receipts that would have shown repayment of Ahava Dairy's indebtedness in full in 2000.[92]

30.    The AEG Litigation was not disclosed on the financial statements of the Ahava Companies or Debtor, but it was known to Signature and documented on Schedule 3.06 titled "Actions Relating to Ahava Food Corp. or the Obligors" of the Credit Agreement prior to closing of the Loan.[93]   In that regard, Bloch testified that Signature chose to enter into the Loan notwithstanding the fact that Debtor had failed to voluntarily disclose the AEG Litigation.[94]

31.    Signature also questioned Debtor and conducted limited due diligence with respect to AOC. Bloch testified that Debtor orally represented to Signature that the purpose of AOC was to allow Fariborz to generate income by selling product of the Ahava Companies in

---

[90] Tr. 2 135–36.
[91] Tr. 1 98.
[92] Tr. 1 98; Tr. 2 242.
[93] Pl.'s Ex. 55.
[94] Tr. 1 239.

California to a different clientele.[95]   During cross-examination, Bloch testified that Signature excluded AOC as an obligor to the Credit Agreement because Signature believed that AOC "was in fact an immaterial affiliate [of the Ahava Companies] because of the sales volume and the target geography to which it was selling its product to"[96] when the Loan was made.   During Bloch's September 27, 2010 deposition taken in connection with this litigation (the "2010 Bloch Deposition"), Bloch similarly testified that AOC was not considered as a guarantor because its relevant tax returns for periods prior to the Loan showed less than $400,000 in revenues on an annual basis.[97]   Accordingly, AOC was included in Schedule 3.11 titled "Subsidiaries or Affiliates of Ahava Food Corp. or the Obligors" as a non-obligor affiliate owned by Debtor and Fariborz as members.[98]   Bloch further indicated that had Debtor "conveyed" to Signature that AOC "was of a substantial revenue size, assets and germane to the integrated business to which [Signature] was lending," Signature would have required AOC's inclusion as a party to the Credit Agreement.[99]

32.    Schedule 3.11 to the Credit Agreement did not break down the percentages of ownership held by Debtor and Fariborz in AOC as of 2005, but Debtor represented to Signature that they each owned fifty percent.  Debtor testified that he conditionally sold his equity interest in AOC to Fariborz when his father died, which occurred after the Credit Agreement was drawn up but prior to the Loan's closing.[100]  Pursuant to an Agreement dated August 15, 2005, Debtor effectuated a sale of his shares of stock in AOC to Fariborz (the "AOC Stock Agreement"), which the parties then valued at $169,284, in consideration for Fariborz's remittance of his one-

---

[95] Tr. 1 103.
[96] Tr. 1 231.
[97] Def.'s Ex. ZZZ, 2010 Bloch Dep. Tr. 28.
[98] Pl.'s Ex. 55.
[99] Tr. 1 232–33.
[100] Tr. 2 116.

third inheritance from their deceased father's estate to Debtor.[101]  The AOC Stock Agreement contained a repurchase provision whereby Debtor could repurchase his fifty percent equity interest in AOC on or before January 2, 2007, upon payment to Fariborz in the amount of $167,284.32.[102]  Debtor conceded during trial that he did not disclose the AOC Stock Agreement or, as he referred to it, the "contingent sale" to Signature prior to execution of the Credit Agreement.[103]

33.    In addition to the foregoing due diligence, Bloch had several discussions with Debtor regarding his personal and business finances.  These discussions covered, among other topics, the outcomes of the equipment appraisals, trends in the performance of the Ahava Companies, and Debtor's personal net worth.[104]

34.    The 2005 Personal Financial Statement, indicated that, as of February 2005, Debtor had a net worth of $2,030,000, exclusive of his ownership interests in the Ahava Companies.[105]

35.    Bloch testified during direct examination that Debtor's "outside net worth" independent of the business assets served as "positive reinforcement" for Signature's business decision to enter into the Loan.[106]  Bloch further testified on cross-examination, however, that Signature took the 2005 Personal Financial Statement "at face value," and that it did not verify the accuracy of the information contained therein.[107]

**C.    Debtor and the Ahava Companies' Initial Loan Performance**

---

[101] Pl.'s Ex. 29.
[102] Pl.'s Ex. 29.
[103] Tr. 2 118.
[104] Tr. 1 89.
[105] Pl.'s Ex. 49; Tr. 1 94.
[106] Tr. 1 94–95.
[107] Tr. 1 229.

36.    For the remainder of 2005 and throughout 2006, AFC performed satisfactorily under the Credit Agreement.  Bloch testified that Signature had provided Debtor with short-term bridge financing during that timeframe, but that borrowing under Facility B at that time was "fairly innocuous."[108]

37.    Internal electronic correspondence written during December 2006, while Signature was contemplating advancing "new money" to Debtor and the Ahava Companies, between bank officers, including Bloch, described Debtor as "a man of his word" who "to date, . . . has lived up to all his promises" and paid all short terms loans as agreed.[109]  Debtor testified that towards the end of 2006, he sought a short-term loan from Signature in the amount of $250,000.00 and that Signature ultimately approved a lesser loan in the amount of $150,000.00.[110]

38.    Bloch testified during cross examination that during the beginning of 2007, the relationship between Debtor and Signature was still good.[111]  AFC had paid off one of the short-term loans in the amount of $150,000.00 and reduced Facility B by approximately $155,000.00.[112]  As of February 2007, AFC was paying its debt in a timely manner and, with respect to additional short-term financing, paying in advance.[113]

**D.    The First Event of Default**

39.    On or about March 2007, Signature learned that M&I Equipment Finance Company ("M&I") had obtained a judgment against LCD in the approximate amount of $650,000.00.  Bloch testified that Signature was notified of the M&I litigation by either Debtor

---

[108] Tr. 1 115.
[109] Def.'s Ex. E.
[110] Tr. 2 289.
[111] Tr. 1 253.
[112] Tr. 1 254.
[113] Tr. 1 254.

or Debtor's counsel and also by Signature's own counsel.[114]    M&I actually obtained two judgments, the first in the amount of $658,994.02 rendered on January 12, 2007 (the "M&I Judgment"), and the second in the amount of $60,553.66 rendered on April 23, 2007 (the "M&I Fee Judgment"), both of which were entered against LCD, AFC, and Debtor (collectively, the "M&I Defendants").[115]    The M&I Defendants filed a motion for reconsideration on January 24, 2007, and a notice of appeal from the M&I Judgment on February 5, 2007.[116]    The M&I Judgment constituted an event of default under the Credit Agreement, but Debtor did not disclose the M&I Judgment to Signature until he became aware of the same approximately two months after its issuance.

40.    Debtor testified that the M&I Judgment arose in connection with funding for the construction of a wastewater treatment plant at the Lowville Facility.  According to Debtor, the Department of Environmental Conservation had become extremely tough regarding the disposal of whey, causing LCD to incur high disposal costs.  LCD contracted with a Canadian company called Hydroxyl to build the wastewater treatment plant and M&I was going to finance the project.[117]    In connection with M&I's financing, Debtor gave M&I a personal guarantee. Hydroxol filed for bankruptcy after M&I rendered payment in full to Hydroxol and M&I later sued the M&I Defendants.[118]    Debtor testified that the M&I Judgment was fraudulently obtained,[119] which was consistent with his prior representations to Bloch,[120] and that the M&I Fee Judgment was for M&I's attorneys' fees incurred in connection with the lawsuit.[121]

---

[114] Tr. 1 117, 256.
[115] Pl.'s Ex. 6.
[116] Pl.'s Ex. 6.
[117] Tr. 2 290.
[118] Tr. 2 291.
[119] Tr. 2 291.
[120] Tr. 1 123.
[121] Tr. 2 291–92.

41.    According to Debtor, he first learned of the M&I Judgment in March 2007, and he immediately contacted Signature and arranged to meet with Bloch and other Signature representatives to discuss the same.[122]    Because Debtor was communicating with M&I about payment options at the time, he did not expect M&I to freeze the Ahava Companies' bank accounts at Signature.[123]

42.    As a result of the M&I Judgment, M&I served Signature with restraining notices for the bank accounts held by AFC and LCD.[124]    According to Bloch, Signature did not actually freeze the bank accounts until it was served with the third restraining notice from M&I, which was in May 2007, and Signature's internal records indicated that a total of $5,673,992.18 was deposited and withdrawn from the subject bank accounts after Signature was served with the initial restraining notice but before Signature took action to comply.[125]    As a result, Signature was sued by M&I and ultimately paid M&I approximately $325,000.00 to $350,000.00 from its own funds to settle the litigation.[126]

43.    On or about March 28, 2007, Signature sent the Obligors a notice of default in connection with the Loan based in part upon the M&I Judgment.[127]

44.    Bloch testified that although Signature had declared an event of default and could have accelerated and demanded payment on the Loan upon learning of the M&I Judgment, Signature instead reserved its rights and decided to "work with [Debtor] to figure out how he was going to resolve [the M&I Judgment]."[128]

---

[122] Tr. 2 291–92.
[123] Tr. 2 295.
[124] Tr. 2 256–57.
[125] Tr. 1 262–63; *See also* Def.'s Ex. GG.
[126] Tr. 1 263.
[127] Joint Stipulation ¶ 15.
[128] Tr. 1 120.

45.    Bloch acknowledged during cross-examination that the M&I Judgment posed a problem for Signature as well as Debtor because Signature's collateral included the proceeds generated by AFC's sales and ordinarily deposited into the frozen bank accounts of AFC and LCD.[129]  Signature had a priority lien on all of the assets and accounts of both AFC and LCD, as well as a right of setoff against the operating accounts.[130]  Once AFC and LCD could no longer use their operating accounts, Signature had to determine how best to protect the proceeds of its collateral and how to collect on the Loan if it could no longer access funds deposited into these accounts.[131]  Further, Signature understood that if AFC and LCD could no longer operate as a result of the M&I Judgment and M&I's subsequent collection efforts, Debtor and the Ahava Companies would have no means of generating funds to be used to repay the Loan.[132]

46.    On March 7, 2007, via electronic correspondence, Debtor advised Bloch that Attorney Stein's advice with respect to dealing with the M&I Judgment was "to pay all of our vendors in cash and collect cash," which Debtor indicated was "[n]ot a bad idea."[133]  Bloch forwarded Debtor's correspondence to senior executives at Signature, who, according to Bloch, collectively agreed that Signature would not overtly assist Debtor in shielding monies from M&I or in "perpetrat[ing] a fraud against one of his creditors."[134]

47.    Contrary to Bloch's testimony that Signature would not assist Debtor in shielding money from M&I, Signature worked directly with Debtor and the Ahava Companies to redirect receivables from the Ahava Companies to SLF, the only entity not subject to the M&I Judgment. Debtor testified that when AFC was no longer able to operate in the wake of the M&I Judgment,

---

[129] Tr. 1 264.
[130] Tr. 1 118.
[131] Tr. 1 264–65.
[132] Tr. 1 264–65.
[133] Def.'s Ex. TTT.
[134] Tr. 1 121.

SLF took over and served former AFC customers.[135]    According to Debtor, Signature directed

him to open three new accounts in the name of SLF, which he did.[136]    AFC receivables were then

deposited into the SLF accounts and Signature's Loan payments were made from those funds.[137]

48.    On June 21, 2007, Bloch sent electronic correspondence to Debtor and to the

controller of the Ahava Companies confirming this arrangement: "Please be advised that due to

the frozen status of the Ahava Food Corp. accounts, all future payments of principal and interest,

fees, expenses, etc. will be taken from St. Lawrence Food Corp.'s (the guarantor's) Signature

Bank account #1500883630."[138]

### E.    Schwartz & Sons

49.    For several months prior to the M&I Judgment, AFC was working to strengthen

its business relationship with an entity called Schwartz & Sons ("S&S"), a New York

corporation and distributor of non-dairy kosher products to the Hasidic community.    S&S was

originally owned by Debtor's nephew's wife.    Debtor testified that AFC could not sell product

directly to any grocery stores within the Hasidic community because customers preferred to buy

from Hasidic-owned businesses.[139]    At that time, AFC was interested in transitioning from using

multiple "one truck" distributors that it traditionally used to sell to customers in the Hasidic

community in order to minimize AFC's exposure and inability to collect receivables from these

one-man distributorships.

50.    Once S&S had become a large customer of AFC, Debtor brought this business

relationship to Bloch's attention.    In late 2006 or early 2007, to alleviate Signature's concern

about a single customer generating a large receivable, Debtor arranged for S&S to maintain a

---

[135] Tr. 2 152.
[136] Tr. 2 296.
[137] Tr. 2 298.
[138] Def.'s Ex. Q.
[139] Tr. 3 4.

bank account at Signature, so that Signature would have direct knowledge of S&S's receivables that were due to the sale of AFC's products as they were received and deposited.[140]  Bloch testified that Signature did not have a problem with Debtor's proposal, although Signature refused to extend a $100,000.00 line of credit to S&S in order for S&S to open its account at Signature.[141]

51.    As S&S's receivable grew, Debtor considered obtaining some sort of security interest from S&S in order to allow AFC to collect directly on receivables of S&S.[142]  AFC and S&S eventually signed a security agreement to that effect.[143]

52.    According to Debtor, S&S quickly became a substantial part of AFC's business. Debtor testified that S&S "filled a gap,"[144] and Bloch confirmed that Signature was fully aware of Debtor's increased reliance on S&S to continue the Ahava Companies' business operations in the face of the M&I Judgment.[145]

53.    On April 18, 2007, AFC sent a letter to certain customers indicating that S&S would be the new distributor of the products that AFC had been selling.[146]  This letter was signed by Ari Katz ("Katz") as the Director of Operations for AFC, although Debtor testified Katz was a truck driver for AFC at that time.[147]

54.    Beginning in April 2007, S&S began serving and invoicing former AFC customers.[148]

---

[140] Tr. 3 11–12.
[141] Tr. 1 267–68.
[142] Tr. 3 7.
[143] Tr. 3 11.
[144] Tr. 3 13.
[145] Tr. 1 122.
[146] Pl.'s Ex. 71.
[147] Tr. 2 182.
[148] Pl.'s Ex. 72.

55.    Bloch indicated that Signature allowed Debtor to distribute and operate through S&S because if Signature had instead foreclosed, it would have closed out M&I. A requirement attendant to Signature's decision, however, was the joinder of S&S to the Credit Agreement in order to ensure Signature's continued first security lien on all assets including those of S&S.[149]

56.    S&S initially refused to assume liability or become indebted to Signature,[150] thereby prompting Debtor to buy out S&S in July or August 2007.[151]

57.    For a brief period of time in the spring of 2007, AFC continued to collect outstanding accounts receivable while using S&S as the sole distributor for the Ahava Companies. During this time frame, Signature learned that Debtor was billing through S&S and depositing what were in actuality AFC's receivables into a SLF operating account at a different bank and then transferring a portion of those funds into the S&S operating account at Signature from which Signature took Loan payments.[152] During his deposition, Bloch confirmed that Signature discussed this arrangement both internally and with its counsel, as well as with Debtor and Debtor's counsel, and although Signature had "some concern about what that would or would not look like to M&I, [it] decided that because [the receivables] were part and parcel of [Signature's] credit facility, that [Signature] would rather have the money flowing through the bank, as opposed to not through the bank."[153] According to Bloch, because Signature had a lien on the assets of the Ahava Companies and Yoni, "[w]hen [Debtor] then collected [the Ahava Companies'] receivables, and effectively then billed them out of [S&S], by extension, those were [Signature's] assets."[154]

---

[149] Tr. 1 122–23.
[150] Tr. 3 13.
[151] Tr. 3 13.
[152] Tr. 1 268
[153] Def.'s Ex. ZZZ, 2010 Bloch Dep. Tr. 99.
[154] Tr. 1 280.

58.    Debtor testified that AFC ceased doing business in June 2007, at or around the time S&S began operating under Debtor's exclusive ownership and control.[155]

### F.    The Forbearance Agreement

59.    Both Debtor and Bloch testified that the default caused by the M&I Judgment prompted the parties to negotiate a forbearance agreement.[156]    During Debtor's June 17, 2010 deposition taken in connection with this litigation (the "2010 Banayan Deposition"), Debtor further testified that Signature was pressing him to sign a forbearance agreement and, hence, he did so to "satisfy [Signature] to be in compliance."[157]

60.    On or about July 11, 2007, the parties to the Credit Agreement entered into a Forbearance Agreement.[158]    AFC remained a named party to the Forbearance Agreement notwithstanding the fact that it had ceased actively doing business earlier in the year.

61.    The termination date of the Forbearance Agreement was September 11, 2007.[159]

62.    Prior to entering into the Forbearance Agreement, Signature conducted additional due diligence, including obtaining an updated equipment appraisal at the Lowville and Ogdensburg Facilities and an updated review of the accounts receivable.[160]  Debtor also submitted to Signature an updated joint personal financial statement (the "2007 Personal Financial Statement") showing a total net worth in the amount of $1,067,000.00.[161]

63.    Debtor testified that Signature did not conduct any additional due diligence regarding AOC at this time.[162]

---

[155] Tr. 2 145–46.
[156] Tr. 1 124; Tr. 3 19.
[157] Pl.'s Ex. 48, 2010 Banayan Dep. Tr. 68.
[158] Pl.'s Ex. 19.
[159] Pl.'s Ex. 19.
[160] Tr. 1 125.
[161] Pl.'s Ex. 50.
[162] Tr. 3 22.

64.    Paragraph 2 of the Forbearance Agreement expressly provided for the reaffirmation of all prior loan documents and obligations contained therein.[163]

65.    Paragraph 9(e) of the Forbearance Agreement stated: "the representations and warranties set forth in each of the Transaction Documents are true and correct as of the date hereof in all material respects (except such representations and warranties that are rendered untrue as a result of the existence of the Existing Defaults) . . . ."[164]

66.    Debtor testified that he did not review the Credit Agreement prior to signing the Forbearance Agreement.[165]

67.    As a condition of Signature's agreement to forbear from exercising its rights under the Credit Agreement, the Forbearance Agreement at paragraph 7(b) required the Obligors to engage a "projections consultant" who was satisfactory to Signature to prepare rolling thirteen week cash flow projections for the Obligors.[166]  Bloch testified that Signature had "lost faith in [Debtor's] ability to project what the needs of [AFC] were and clearly to curtail the losses that kept escalating."[167]  He further testified that the intended purpose of the projections consultant, therefore, was to find and fix the operational issues that were causing the Ahava Companies to incur losses, which was a prerequisite to a potential sale of the Ahava Companies.[168]

68.    At Signature's instruction, the Ahava Companies hired the management and consulting firm of Getzler Henrich ("Getzler").

69.    Although Block testified that Signature made "recommendations of three different firms,"[169] certain factors suggest that Debtor had but one choice.  First, on May 16, 2006, Bloch

---

[163] Pl.'s Ex. 19.
[164] Pl.'s Ex. 19.
[165] Tr. 3 20.
[166] Pl.'s Ex. 19.
[167] Tr. 2 39.
[168] Tr. 2 32.
[169] Tr. 1 132.

sent pre-engagement electronic correspondence to Joel Getzler ("Joel") wherein Bloch stated that Signature would "require the formal retaining of your firm" before approving Debtor's request for additional short-term financing.[170]   In that correspondence, Bloch further advised Mark Samson ("Samson"), a Getzler consultant, of the short-term loan financing terms and indicated that Debtor had not seen the Forbearance Agreement yet, but that Bloch had outlined the structure of the Forbearance Agreement to Debtor via electronic correspondence.[171]   Second, other pre-engagement correspondence between Bloch and Getzler representatives revealed sensitive and/or confidential information about the Ahava Companies as if Bloch knew the engagement was imminent.   Third, contrary to Bloch's repeated testimony that neither he nor any other representative of Signature ever engaged in discreet communications with Getzler or its representatives,[172] the record reflects post-engagement communications between Bloch and Getzler representatives occurred daily and, at times, were intended to be "confidential" or private, thereby suggesting that Getzler was acting on behalf of Signature rather than Debtor.[173] Accordingly, the record supports a finding that Signature required the engagement of Getzler as a condition precedent to the Forbearance Agreement.   Debtor's testimony is also consistent with this finding.   According to Debtor, he did not want to hire consultants because he did not feel that the Ahava Companies needed or could afford them at the time,[174] and he also stated that Signature introduced him only to Getzler, hence, he did not have any choice in the matter.[175]

70.   During Getzler's retention, Debtor paid Getzler $38,500.00 per week for the work of two consultants, Samson and Fred Kessler ("Kessler").   Kessler was eventually replaced by

---

[170] Def.'s Ex. L.
[171] Def.'s Ex. L.
[172] Def.'s Ex. ZZZ, 2010 Bloch Dep. Tr. 43; Tr. 2 30.
[173] Def.'s Exs. S, AA.
[174] Tr. 3 37.
[175] Tr. 2 123.

Ron Groling.[176]   During the time the consultants were in place, Samson was the main contact between the Ahava Companies and Signature.[177]   Debtor testified that he was rarely in direct contact with Signature from this point forward.[178]   According to Debtor, after Getzler had been in place for approximately four or five weeks, Signature requested that Getzler take full control of the Ahava Companies as a restructuring agent or CEO, which Getzler promptly refused.   Debtor testified, however, that Getzler was already running the Ahava Companies and involved in every aspect of the businesses when this request was made.[179]

71.    Signature knew at the time of Getzler's engagement that Debtor was searching for take-out financing and/or a potential buyer for the Ahava Companies.   Bloch repeatedly acknowledged that Debtor was actively "looking to take out Signature in whole or in part" both before and after Getzler was put in place,[180] and that he had no reason to believe that Getzler was not acting in good faith to assist Debtor in finding another lender to provide alternate or replacement financing.[181]   Bloch testified that Signature was willing to invest additional funds in the Ahava Companies under the watchful eye of Getzler because certain manufacturing issues were being corrected and Signature understood that it would only be made whole if Debtor could refinance or orchestrate a sale, either of which would have required positive cash flow and a return to profitability.[182]   The prospect of full repayment by virtue of either option was unquestionably a motivating factor for Signature to enter into the Forbearance Agreement.

---

[176] Tr. 3 37–38.
[177] Def.'s Exs. AA, OO, PP, WW, YYY.
[178] Tr. 3 40.
[179] Tr. 3 41–43.
[180] Def.'s Ex. ZZZ, 2010 Bloch Dep. Tr. 125; Tr. 2 61–66.
[181] Def.'s Ex. ZZZ, 2010 Bloch Dep. Tr. 126.
[182] Tr. 2 52.

72.    Prior to Getzler's engagement, the Ahava Companies carried overdrafts of approximately $40,000.00 to $70,000.00 on a daily basis that were routinely covered.[183]   The Ahava Companies had approximately $140,000.00 to $150,000.00 available on Facility B on which to draw the overdrafts and they had not ever exceeded the Facility B maximum.  As stated on Schedule 3 to the Forbearance Agreement, the amounts due and owing to Signature at that time under the Credit Agreement were $5,544,449.73 under Facility A and $1,302,733.68 under Facility B.[184]   In addition, Signature had lent the Ahava Companies an additional $750,000.00, which sum was also included on this Schedule.[185]   With  Getzler at the helm, the Ahava Companies' overdrafts increased by $4.1 million in excess of the Facility B maximum.[186]   Bloch confirmed during trial that Signature relied upon the rolling thirteen week projections prepared by Getzler and, irrespective of the fact that the projections continued to show "an ever increasing cash burn rate,"[187] Bloch continued to recommend and Signature continued to approve substantial overdrafts while Getzler was in place.[188]

G.    The First Amendment to the Forbearance Agreement

73.    On or about August 27, 2007, and at the insistence of Signature, the parties to the Credit Agreement, S&S, and Ana entered into a Joinder Agreement, Waiver, and First Amendment to the Forbearance Agreement (the "First Amendment") to continue Signature's forbearance from exercising its rights and remedies under the Credit Agreement and to add S&S and Ana as new obligors and parties to the existing Credit Agreement and Forbearance Agreement.[189]   S&S thereby joined the obligations set forth in the Credit Agreement and

---

[183] Tr. 3 43.
[184] Pl.'s Ex. 18.
[185] Pl.'s Ex. 18.
[186] Tr. 3 44.
[187] Tr. 1 170.
[188] Tr. 2 50–51; Def.'s Ex. GGG.
[189] Pl.'s Ex. 19.

reaffirmed in the Forbearance Agreement and granted Signature a security interest in substantially all of its assets.

74.     In connection with the First Amendment, SRM issued an opinion letter to Signature on August 27, 2007 (the "Opinion Letter").  Among other opinions expressed therein, SRM stated that, as the date of issuance, each corporate obligor was validly existing and in good standing under the laws of the State of New York.[190]

75.     Attached to the Opinion Letter was a Manager's Certificate for Yoni identifying Debtor as the "sole Member and the sole Manager of Yoni."[191]  During trial, however, Debtor testified that he had sold a forty-nine percent membership interest in Yoni to Isaac Chera ("Chera") in January 2007, as memorialized by an Assignment of Membership Interest dated February 8, 2007 (the "Chera Assignment").[192]  Debtor further testified that he had been introduced to Chera by a real estate broker in 2006, during which time Debtor was looking for additional sources of funding for the Ahava Companies.[193]

76.     The First Amendment at paragraph 3(f) required the Obligors to maintain the projections consultant on a full-time basis.[194]

77.     The First Amendment at paragraph 3(g) converted $1,750,000.00 of the overdrafts that had been extended into a new short-term loan (the "Forbearance Loan").  In connection with this Forbearance Loan, ACF and SLF executed a Promissory Note, which was guaranteed by the Obligors.[195]

---

[190] Pl.'s Ex. 19.
[191] Pl.'s Ex. 19.
[192] Pl.'s Ex. 56.
[193] Tr. 3 36–37.
[194] Pl.'s Ex. 19;
[195] Pl.'s Ex. 19; Tr. 1 145.

78.     The First Amendment at paragraph 8 required the Obligors to reaffirm each of the representations and warranties set forth in the Forbearance Agreement and to also represent and warrant that no forbearance termination event, as defined in the Forbearance Agreement, had occurred.[196]

79.     Debtor testified that by June 2007, when the First Amendment was signed, AFC and LCD had stopped doing business, albeit without following the required corporate formalities to close or wind down the corporations.[197]  At that time, Debtor was doing business through SLF and S&S.[198]

80.     From the testimony produced at trial and the documentary evidence, and notwithstanding Debtor's failure to ensure the proper editing of the First Amendment, it is clear that Signature had a working knowledge of Debtor's business operations, whether run through the Ahava Companies or S&S.  This is particularly true in light of Getzler's involvement in Debtor's daily business operations for some time prior to the First Amendment.

**H.     The Second Amendment to the Forbearance Agreement**

81.     On September 11, 2007, Obligors and Signature entered into a Second Amendment to the Forbearance Agreement (the "Second Amendment"), pursuant to which Signature, *inter alia*, extended the time for repayment of all obligations under the Credit Agreement to October 5, 2007.[199]

82.     The Second Amendment at paragraph 4 also contained reaffirmations of representations and warranties, representations of no new events of default, and waivers of any

---

[196] Pl.'s Ex. 19.
[197] Tr. 2 145.
[198] Tr. 2 146–47.
[199] Pl.'s Ex. 20.

claim or defense against the obligations under the Credit Agreement being due and owing immediately.[200]

83.    By virtue of the Second Amendment, Debtor reaffirmed his earlier incorrect representation that he was the sole member and one hundred percent owner of Yoni.[201]

84.    Debtor testified that as of the effective date of the First Amendment, however, Getzler and Signature knew or should have known that he was no longer the sole owner of Yoni as a result of the Chera Assignment because Yoni had been the subject of negotiations with various investors or financial institutions in which Samson participated as a consultant to the Ahava Companies.[202]    Debtor further testified that he had informed Signature and Bloch personally of the Chera Assignment prior to the Second Amendment.    In connection with Debtor's efforts to refinance or sell the Ahava Companies, Debtor executed term sheets with prospective investors or financial institutions that accurately reported his membership interest in Yoni.  At least one term sheet from Greystone Business Credit II, LLC ("Greystone") accurately stating Debtor's reduced membership interest in Yoni was provided directly to Signature.[203]

85.    On September 14, 2007, Bloch indicated in electronic correspondence to Debtor that Signature had been made aware of the change in Yoni's membership and asked Debtor to confirm whether he had sold equity in Yoni after the effective date of the Credit Agreement.[204]

86.    The Chera Assignment constituted a breach of the First and Second Amendments. Because the Chera Assignment did not impact Yoni's status as an obligor under the Credit

---

[200] Pl.'s Ex. 20.
[201] Pl.'s Ex. 20.
[202] Tr. 2 149–50; Def.'s Ex. HH.
[203] Pl.'s Ex. 100.
[204] Def.'s Ex. HH.

Agreement or the First or Second Amendments, however, Signature did not declare an event of default or foreclose on the Loan upon learning of the same.[205]

87.    For several months following the Second Amendment, Debtor worked diligently with Getzler's assistance to find a purchaser or replacement financing entity for the Ahava Companies to take out Signature.  As previously noted, Bloch was made aware of Debtor's efforts in this respect and, at his request, he was kept current on all developments by Samson.[206] In fact, Bloch attended certain meetings between the investors or financial institutions, Debtor, counsel, and Getzler[207] and he personally provided information about the Ahava Companies to at least one such entity during that entity's due diligence process.[208]

88.    By the end of November 2007, Debtor had become so displeased with Getzler's performance and the increased personal and business liability due to the additional overdrafts taken during Getzler's engagement that he terminated Getzler so that he could regain control of the Ahava Companies.[209]  Debtor testified that he "had lost faith at that point in the ability of the consultant[s] to do what the bank wanted [Getzler] to do, and [he] felt that just to go deeper and deeper into [debt] just . . . [made] no sense," especially when he had personal liability for the Debt as a guarantor.[210]

89.    After firing Getzler, the Ahava Companies and S&S ceased paying interest on Facility B.  These events prompted Signature to cut off funding,[211] thereby making it impossible for the Ahava Companies and S&S to continue operating.[212]

---

[205] Tr. 2 15.
[206] Tr. 2 61–66; Def.'s Exs. BB, II.
[207] Def.'s Ex. JJ.
[208] Def.'s Ex. UU.
[209] Tr. 3 45–46.
[210] Tr. 3 46.
[211] Tr. 1 181.
[212] Tr. 3 65–66.

90.     Debtor testified that S&S ceased operations on or about November 2007, and it ceased doing business entirely on or about January 2008.[213]

### I.     2007 Filings, Leases, and Agreements

91.     On June 6, 2007, AOC registered in New York as a foreign limited liability company.[214]

92.     On June 13, 2007, AOC filed a Certificate of Assumed Name to conduct business in New York as North Country Manufacturing.  Its application listed its principal New York place of business as the Lowville Facility.[215]

93.     On July 30, 2007, as a precursor to S&S's joinder to the Credit Agreement, AFC and S&S executed a Lease Assumption Agreement whereby S&S agreed for a period of two years to assume certain of AFC's obligations to Signature and to AFC's vendors, in exchange for the ability to assume AFC's lease with Yoni for 110 Beard[216] and use of AFC's truck fleet.[217]

94.     Or about August 29, 2007, two days after the First Amendment, Debtor, on behalf of LCD, entered into a Commercial Lease with AOC whereby AOC agreed to lease the Lowville Facility beginning on August 29, 2007, and terminating on August 28, 2012 (the "LCD Lease").[218]

---

[213] Tr. 2 175.
[214] Joint Stipulation ¶ 21; Pl.'s Ex. 12.
[215] Joint Stipulation ¶ 21; Pl.'s Ex. 13.
[216] The Stipulation of Facts at paragraph 5, note 1, provides the following background with respect to the leasing arrangements for 110 Beard.  Beginning October 1, 2006 through April 25, 2008, the lessor of 110 Beard was the IDA.  Beginning August 25, 2005 through April 25, 2008, Yoni was the lessee and Ahava the sublessor.  Yoni and the IDA entered into an Amended and Restated Lease Agreement dated October 1, 2006 (the "IDA Lease Agreement"), pursuant to which the IDA leased its interest in 110 Beard to Yoni.  The IDA Lease Agreement governed any subtenancy of 110 Beard.  As required under the IDA Lease Agreement, Yoni and Ahava entered into an Amended and Restated Sublease Agreement dated October 1, 2006, pursuant to which Yoni sublet 110 Beard to Ahava.
[217] Pl.'s Ex. 24.
[218] Pl.'s Ex. 21.

95.     On September 1, 2007, the State of New York, Department of Agriculture and

Markets (the "Department of Agriculture"), issued a Milk Dealer License to AOC.[219]

96.     On October 18, 2007, AOC filed a second Certificate of Assumed Name to

conduct business in New York under the assumed name of Ahava National Food Distributor

("Ahava National").[220]

97.     On or about October 30, 2007, Debtor, on behalf of SLF, entered into a

Commercial Lease with AOC whereby AOC agreed to lease the Ogdensburg Facility beginning

on October 30, 2007, and terminating on October 29, 2012 (the "SLF Lease").[221]

98.     The Lease Agreements were prohibited by the Credit Agreement.[222]  Signature

did not consent to either the LCD Lease or the SLF Lease (collectively, the "Lease

Agreements"),[223] notwithstanding that such consent was required by the Credit Agreement.[224]

99.     Debtor testified that he entered into the Lease Agreements on behalf of LCD and

SLF at a time when the Ahava Companies were "hemorrhaging substantially" in order to

generate an infusion of cash for the purpose of converting the manufacturing facilities into lean

manufacturing environments at the recommendation of Kessler.[225]  According to Debtor, he

followed Getzler's recommendation, which had been conveyed to Signature as part of a two-part

plan to increase efficiencies and reduce manufacturing costs, and he tapped into the only source

of capital investment known to him at the time—AOC.[226]

100.    Due to the difficult nature of the kosher dairy business, Debtor testified during his

deposition and at trial that the Lease Agreements actually benefitted Signature because AOC's

---

[219] Pl.'s Ex. 31.
[220] Joint Stipulation ¶ 23; Pl.'s Ex. 14.
[221] Pl.'s Ex. 22.
[222] Tr. 1 at 174; Pl.'s Ex. 55.
[223] Tr. 1 174–75.
[224] Pl.'s Ex. 55.
[225] Tr. 3 58.
[226] Tr. 3 59.

lease and operation of the Lowville and Ogdensburg Facilities preserved the value of Signature's collateral.  According to Debtor, if AOC had not stepped in to run the dairy manufacturing plants, the dairies would have lost their contracts with the dairy farms, which would have been disastrous as the conversion to kosher farming and the relationship with those existing farms took years of investment.  Further, the equipment, if left idle, would have precipitously declined in value.[227]  During his deposition, Debtor vigorously defended his decision to enter into the Lease Agreements by stating, "[a]s a businessman, I did the right thing at that time."[228]  The end goal, as described by Debtor, was to preserve the assets of AFC and SLF.

101.    The income generated by the Lease Agreements was sufficient to cover the collective real property and equipment lease obligations of LCD and SLF, which Debtor testified amounted to approximately $25,000.00 per month.[229]

102.    Between August 1, 2007 and November 2007, AOC loaned S&S and Primo Foods, which Debtor testified was a d/b/a of SLF,[230] $757,269.20.[231]  Debtor testified that the aggregate loan amount was due to AOC's numerous payments on behalf of S&S or Primo Foods to cover the mortgage on 110 Beard, to satisfy invoices from various kosher farms and a supplier of imported turkey, and for general cash loans to S&S and Primo Foods.[232]

103.    Debtor also testified that the checks written by AOC during this timeframe were deposited into the LCD account at Signature,[233] as evidenced by the deposit stamps on the back of the checks.[234]

---

[227] Pl.'s Ex. 48, Banayan Dep. Tr. 128; Tr. 3 67–68.
[228] Pl.'s Ex. 48, Banayan Dep. Tr. 118.
[229] Tr. 3 59–60.
[230] Tr. 3 61.
[231] Def.'s Ex. ZZ.
[232] Tr. 3 61–65.
[233] Tr. 3 62–63.
[234] Def.'s Ex. ZZ.

104.    Getzler was intimately familiar with the Ahava Companies' financials, including the amount of the Ahava Companies' respective daily deposits and into which bank accounts those deposits were being made.[235]    As such, Signature was also aware that money was being deposited into bank accounts at other institutions and then transferred to SLF's account at Signature.    One such account at HSBC Bank USA, N.A. ("HSBC") belonged to North County Manufacturing.[236]    This account was frequently the subject of electronic correspondence between Samson and Bloch and, in fact, Samson reported regularly to Bloch on the deposit amounts made to operating accounts at both Signature and HSBC.[237]

105.    By November 2007, AOC and Ahava National were invoicing former customers of AFC and S&S.[238]    Debtor confirmed that the initial customers of AFC eventually became customers of S&S and, eventually, of AOC.[239]

106.    By November 2007, S&S no longer had funding and it could not meet any of its payment obligations to Signature or otherwise, including the Lease Assumption Agreement that it had entered into with AFC.    Accordingly, on November 27, 2007, AOC and S&S entered into a Settlement Agreement, which in actuality was a lease assumption agreement whereby AOC agreed to assume the lease for 110 Beard.[240]    According to the Settlement Agreement, S&S owed AOC $780,000.00 on an outstanding account receivable.

107.    Shortly thereafter, on February 11, 2008, the Department of Agriculture notified AOC that the milk dealer license for AOC was amended from a restrictive license as a milk

---

[235] Def.'s Ex. XXX.
[236] Def.'s Ex. RR.
[237] Def.'s Ex. XXX.
[238] Pl.'s Exs. 74, 75.
[239] Tr. 2 179–86.
[240] Pl.'s Ex. 23.

processor to a milk dealer authorized to purchase, sell, and distribute milk and to process or manufacture milk at the Lowville and Ogdensburg Facilities.[241]

### J.    The AEG Settlement

108.    Sometime in 2007, while Samson was still a consultant at the Ahava Companies, the long dormant AEG Litigation became active.[242]

109.    At this time, the Ahava Companies were in severe financial distress and they owed approximately $65,000.00 to $67,000.00 in attorneys' fees.  In order to defend the AEG Litigation, Debtor would have had to pay the outstanding fees in full and provide a new retainer. Debtor testified that he wanted to defend the AEG Litigation but he needed Samson's permission to do so because Samson had to approve the Ahava Companies' budget on a weekly basis and any checks written without Samson's approval would not have been honored.[243]  Debtor instead asked the attorneys who had represented the AEG Defendants in the AEG Litigation at its inception to continue to represent them and "fight the case."[244]

110.    On or about February 7, 2008, the parties to the AEG Litigation entered into a Stipulation and Agreement of Settlement (the "AEG Settlement") providing, *inter alia*, for: (1) payment of a cash settlement in the total amount of $250,000.00, payable in equal monthly installments of $25,000.00 over the course of ten consecutive months; (2) entry of a judgment against Ahava Dairy, LCD, and Debtor in the amount of $3.5 million; (3) entry of a judgment against AFC in the amount of $325,000.00; and (4) in the event of nonpayment of the $325,000.00, entry of a judgment against AFC in the amount of $3.5 million.[245]  In exchange,

---

[241] Pl.'s Ex. 31.
[242] Tr. 3 27.
[243] Tr. 3 28–29.
[244] Tr. 3 34.
[245] Pl.'s Ex. 24.

AEG agreed to release "all claims, demands, debts, liabilities, losses, rights, and causes of action" related to the parties' 1996 transaction with prejudice.[246]

111.    Accordingly, the Honorable Robert W. Sweet, United States District Judge, issued a Final Money Judgment and Order of Dismissal with Prejudice in the AEG Litigation on March 10, 2008 (the "AEG Judgment").[247]

112.    Notwithstanding that the Ahava Companies were financially strained and without the means to satisfy the judgments resulting from the AEG Settlement, Debtor agreed to the AEG Settlement because he was "still hoping to somehow reach an agreement with Signature . . . , get some lenders in and revive . . . the companies that [he] had been running for the last 20 years."[248]  He simply was not ready to "put a nail in the coffin" or "throw in the towel."[249] Further, Debtor explained that he was dually motivated to reduce his personal liability as well as the liabilities of the Ahava Companies collectively because, although they were no longer operating, Debtor still hoped to be able to market and sell S&S and he did not want S&S to somehow become joined and embattled in the AEG Litigation.[250]  By that point, however, S&S had also ceased operations.[251]

113.    Debtor testified that AFC did not have the ability to fund the AEG Settlement and AOC therefore agreed to pay the $325,000.00 in exchange for consideration.[252]

114.    On February 20, 2008, AFC and AOC entered into a Trademark Purchase Agreement whereby AOC agreed to satisfy the AEG Judgment in full and to fund the AEG Settlement for AFC's benefit in exchange for AFC's transfer and assignment of certain

---

[246] Pl.'s Ex. 24.
[247] Pl.'s Ex. 16.
[248] Tr. 3 35.
[249] Tr. 3 at 35.
[250] Tr. 2 207.
[251] Tr. 2 208.
[252] Tr. 2 208.

registered trademarks.[253]   To effectuate the Trademark Purchase Agreement, Debtor executed a

Trademark Assignment on behalf of AFC on March 6, 2008.[254]

115.    AFC's trademarks were encumbered by security interests in favor of Signature

and, thus, the Trademark Assignment was in breach of the Credit Agreement, which prohibited

transfers of Signature's collateral outside the ordinary course of business without Signature's

consent.[255]

116.    Debtor testified that the only assets that AFC owned at the time, which he

believed were transferable notwithstanding Signature's interests under the Security Agreement,

were certain kosher trademarks valued at approximately $100,000.00.[256]  Debtor believed at that

time that he was allowed to leverage the trademarks provided he obtained fair market value,

which he had learned approximately six months earlier while trying to sell or lien the trademarks

with Samson's assistance to generate revenue for AFC.[257]

### K.    Signature's Lawsuits and Related Events

117.    In December 2007, Signature sent letters under Section 9-607 of the New York

Uniform Commercial Code ("9-607 Letters") to the top one hundred accounts receivable debtors

of AFC, as derived from AFC's records dating as late as November 2007, which included

account names, addresses, and outstanding amounts due, demanding that the recipients send

Signature all payments due to any of the Ahava Companies, AOC, and Ahava National.[258]

118.    In response to the 9-607 Letters, on or about December 27, 2007, Debtor,

identifying himself as President of Ahava National, sent letters to several of Ahava National's

---

[253] Pl.'s Ex. 25.
[254] Pl.'s Ex. 26.
[255] Pl.'s Ex. 55.
[256] Tr. 3 35–36.
[257] Tr. 3 36.
[258] Tr. 1 182; Def.'s Ex. FFF.

customers directing payment to be made to Ahava National rather than Signature.[259]  In January

2008, AOC's counsel similarly wrote to AOC's customers informing them that AOC and Ahava

National were not indebted to Signature and that Signature therefore did not have a security

interest in AOC's receivables.[260]

119.    On December 27, 2007, Signature commenced a lawsuit (the "State Court

Litigation") against Debtor, the Ahava Companies, Yoni, S&S (collectively, the "Judgment

Debtors"), and Ana in the Supreme Court of the State of New York (the "Supreme Court").[261]

120.    On March 7, 2008, the Supreme Court granted summary judgment to Signature:

(1) against Ana in the amount of $1,781,621.53, plus costs and disbursements; and (2) against

the Judgment Debtors in the amount of $9,338,103.90, plus costs and disbursements

(collectively, the "State Court Judgment").[262]

121.    Signature commenced a separate action in the Supreme Court on or about April 2,

2008, against, among others, AOC, Debtor, and Fariborz, which was removed to federal court in

April 2008 (the "Federal Litigation").[263]

122.    On or about July 1, 2008, Signature commenced a separate action against AFC

and AOC, among others.[264]

123.    On July 9, 2008, Signature conducted a secured party sale of substantially all of

the personal property of the Ahava Companies and S&S.[265]  At that sale, Signature credit bid for

---

[259] Pl.'s Ex. 34.
[260] Def.'s Ex. KKK.
[261] Joint Stipulation ¶ 29.
[262] Joint Stipulation ¶ 30.
[263] Joint Stipulation ¶¶ 31–32.
[264] Joint Stipulation ¶ 33.
[265] Joint Stipulation ¶ 34.

the assets through one of its affiliates, SB AHLCSLSS, LLC, for $1,500,000.00.[266]  In January

2009, Signature sold those assets to Toobro for $1,000,000.00.[267]

L.      AOC's Chapter 11 Filing

124.    Following the demise of the Ahava Companies, Debtor immediately began

working on behalf of AOC in order to obtain new financing.[268]  In this role, Debtor corresponded

with Bibby Financial Services[269] and Amerisource Funding,[270] along with other entities.   In

correspondence sent or received by Debtor in relation to transactions between AOC and these

entities, Debtor was identified as an officer of AOC.

125.    Further, in certain correspondence sent by Ahava National to customers, Debtor

identified himself as President of AOC,[271] although Debtor testified that this was inaccurate as

he never held an officer position with AOC.[272]

126.    Debtor testified that his focus shifted following the Federal Litigation to

"protecting his brother and his brother's asset" to the extent possible and that no assets had been

fraudulently diverted from the Ahava Companies or S&S to AOC.[273]  Debtor's efforts, however,

inevitably failed.

127.    AOC filed a Chapter 11 bankruptcy petition with the United States Bankruptcy

Court for the Central District of California (the "California Bankruptcy Court") on or about July

15, 2008.[274]

---

[266] Tr. 1 205–08.
[267] Tr. 1 216.
[268] Tr. 2 220; Pl.'s Exs. 101–110.
[269] Pl.'s Ex. 101.
[270] Pl.'s Ex. 105.
[271] Pl.'s Ex. 34.
[272] Tr. 2 186–87.
[273] Pl.'s Ex. 48, Banayan Dep. Tr. 180–81.
[274] Joint Stipulation ¶ 35.

128.    The California Bankruptcy Court dismissed AOC's bankruptcy case on January 6, 2009.[275]

## V.    DISCUSSION

### A.    Exceptions to Discharge Generally

The "central purpose of the Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'"[276]    The discharge provided by the Code is meant to effectuate this "fresh start" policy of bankruptcy relief.[277]    Discharge, however, is limited to the "'honest but unfortunate debtor.'"[278]    The Code, therefore, also provides protection to creditors whom the debtor has harmed by egregious or fraudulent conduct.[279]    In order to ensure that only the honest debtor is relieved from the oppressive burden of pre-bankruptcy debts, Congress chose to exclude from the general policy of discharge certain categories of debts, including those obtained by fraud.[280]    In so doing, "Congress evidently concluded that the creditors' interest in recovering full payment of debts in these categories outweighed the debtors' interest in a complete fresh start."[281]    By virtue of the exceptions to discharge codified in § 523, "the malefic debtor may not hoist the Bankruptcy Code as protection from the full consequences of fraudulent conduct."[282]

---

[275] Joint Stipulation ¶ 36.

[276] *Grogan v. Garner*, 498 U.S. 279, 286 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)).

[277] *Id.*; *accord, e.g.*, *Deady v. Hanson (In re Hanson)*, 432 B.R. 758, 770 (Bankr. N.D. Ill. 2010) (citing *Vill. of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 1990)).

[278] *Grogan*, 498 U.S. at 286 (quoting *Local Loan Co.*, 292 U.S. at 244); *accord CM Temp. Servs. v. Bailey (In re Bailey)*, 375 B.R 410, 415 (Bankr. S.D. Ohio 2007) ("discharge is a privilege, and not a right, and should only benefit an honest debtor" (citing *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996) (internal citations omitted)).

[279] *St. Laurent v. Ambrose (In re St. Laurent)*, 991 F.2d 672, 680 (11th Cir. 1993).

[280] *Grogan*, 498 U.S. at 287; *See also* 11 U.S.C. § 523(a)(2), (4).

[281] *Grogan*, 498 U.S. at 287.

[282] *In re St. Laurent*, 991 F.2d at 680.

In order to balance these competing interests, the United States Supreme Court has held that a creditor seeking to except its claim from discharge must establish the nondischargeability of the claim within the parameters of § 523(a) by a preponderance of the evidence.[283]  Because "the consequences to a debtor whose obligations are not discharged are considerable,"[284] it is a well-established rule that exceptions to discharge are to be construed strictly against a creditor and liberally in favor of a debtor.[285]

### B.    Section 523(a)(2)(A)

Section 523(a)(2)(A) excepts from discharge any debt "for money, . . . or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."[286]  This fraud exception is intended to "prohibit the discharge of any liability arising from a debtor's fraudulent acquisition of money, property, etc.," and to make the victimized creditor whole.[287]  Its application, hence, "implements the fundamental bankruptcy policy that only those debts which are honestly incurred may be discharged."[288]

This Court recently examined the various types of conduct covered by § 523(a)(2)(A)– only those frauds involving "moral turpitude or intentional wrong" or actual fraud are included within this exception to discharge.[289]  The determination of whether a debt is excepted from discharge under this subsection depends on a number of factors, including, "whether money, . . .

---

[283] *Grogan*, 498 U.S. at 287–88 (refusing to apply the clear and convincing standard to the fraud exception codified in § 523(a)(2) and inferring instead that "Congress intended the ordinary preponderance standard to govern the applicability of all the discharge exceptions").

[284] *Denton v. Hyman (In re Hyman)*, 502 F.3d 61, 66 (2d Cir. 2007), *cert. denied*, 555 U.S. 1097 (2009) (noting that "in many instances, failure to achieve discharge can amount to a financial death sentence").

[285] *Geiger v. Kawaauhau (In re Geiger)*, 113 F.3d 848, 853 (8th Cir. 1997) (citations omitted); *accord State Bank of India v. Chalasani (In re Chalasani)*, 92 F.3d 1300, 1310 (2d Cir. 1996).

[286] 11 U.S.C. § 523(a)(2)(A).

[287] *Cohen v. De La Cruz*, 523 U.S. 213, 220–23 (1998).

[288] *EDM Machine Sales, Inc. v. Harrison (In re Harrison)*, 301 B.R. 849, 853 (Bankr. N.D. Ohio 2003).

[289] *Scheidelman v. Henderson (In re Henderson)*, 423 B.R. 598, 621 (Bankr. N.D.N.Y. 2010) (quoting 4 Lawrence P. King, Collier on Bankruptcy ("Collier's") (MB) ¶ 523.08[1][d] (15th Rev. Ed. 2006) ("fraud implied in law, which may be established without imputation of bad faith or immorality, is insufficient")).

or an extension, renewal or refinancing of credit has been obtained, . . . and the character of the false pretenses or representation or actual fraud."[290]    Because false pretenses, false representation, and actual fraud represent differing concepts,[291] they have somewhat different meanings and each one merits a brief discussion.

### 1.    False Pretenses

To prove that a debt arose from false pretenses, the plaintiff must show:

> (1) an implied misrepresentation or conduct by the debtor; (2) promoted knowingly and willingly; (3) to create a contrived or misleading understanding of the transaction on the part of the plaintiff; (4) which wrongfully induced [the] plaintiff to advance money, property, or credit to the debtor.[292]

Generally, "[a] false pretense is defined as 'conscious deceptive or misleading conduct calculated to obtain or deprive another of property.  It is the practice of any scam, scheme, subterfuge, artifice, deceit or chicane in the accomplishment of an unlawful objective'" on behalf of the debtor.[293]    "It has also been described as the product of multiple events, acts, or representations undertaken by the debtor which purposely create a contrived and misleading understanding of a transaction that . . . wrongfully induces the creditor to extend credit to the debtor."[294]    False pretenses, therefore, do not necessarily require an express misrepresentation. Rather, silence, or the concealment of a material fact, when there is a duty to disclose, may constitute the basis of false pretenses.[295]

### 2.    False Representation

---

[290] Collier's ¶ 523.08[1].

[291] *Henderson*, 423 B.R. at 621 (citing *Vidomlanski v. Gabor (In re Gabor)*, 2009 Bankr. LEXIS 3110, at *11 (Bankr. S.D.N.Y. Oct. 8, 2009) (citing *Sandak v. Dobrayel (In re Dobrayel)*, 287 B.R. 3, 12 (Bankr. S.D.N.Y. 2002))); *see also* Collier's ¶ 523.08 (distinguishing actual fraud from false pretenses or false representations).

[292] *Henderson*, 423 B.R. at 621 (citing *Gabor*, 2009 Bankr. LEXIS 3110, *12 (citing *Lubit v. Chase (In re Chase)*, 372 B.R. 125, 128 (Bankr. S.D.N.Y. 2007))).

[293] *Indo-Med Commodities, Inc. v. Wisell (In re Wisell)*, 2011 Bankr. LEXIS 3112, *22 (Bankr. E.D.N.Y. Aug. 16, 2011) (citing *Gentry v. Kovler (In re Kovler)*, 249 B.R. 238, 261 (Bankr. S.D.N.Y. 2000)).

[294] *Id.* at *23 (citing *Dobrayel*, 287 B.R. at 12 (quoting *Evans v. Dunston (In re Dunston)*, 117 B.R. 632, 641 (Bankr. D. Colo. 1990) (internal quotation marks omitted))).

[295] *Farraj v. Soliz (In re Soliz)*, 201 B.R. 363, 369 (Bankr. S.D.N.Y. 1996) (collecting cases).

To prove that a debt arose from false representation, the plaintiff must show: "(1) [the] debtor made a false or misleading statement; (2) with the intent to deceive; (3) on which the creditor justifiably relied; (4) in order to induce the creditor to turn over money or property to the debtor."[296]  A false representation can be shown through either an express statement or through an omission where the circumstances are such that disclosure is necessary to correct what would otherwise be a false impression.[297]

As the language of § 523(a)(2)(A) plainly imparts, not all express statements are actionable under the "false representation" category of this subsection.  Rather, only oral or written statements "*other than* . . . statement[s] respecting the debtor's or an insider's financial condition" fall within the scope of § 523(a)(2)(A).[298]  This language creates an exception to the exception.[299]

Notwithstanding the critical importance of the phrase "respecting the debtor's or insider's financial condition" to determine the viability of a § 523(a)(2)(A) claim premised upon false representation in the first instance, the parameters of this limiting language are rarely examined or explained in case law.  As noted by the Tenth Circuit, this phrase has a range of potential meanings.[300]  Among those courts that have considered the issue, two camps have emerged:

> Under what many of the courts who have considered this issue refer to as the 'broad interpretation,' a statement 'respecting the debtor's . . . financial condition' is any communication that has a bearing on the debtor's financial position.  Thus, the broad interpretation posits that a communication addressing the status of a single asset or liability qualifies as 'respecting the debtor's . . . financial condition.'
> Under what courts refer to as the 'strict interpretation,' a statement 'respecting the debtor's . . . financial condition' is any communication that

---

[296] *Henderson*, 423 B.R. at 621 (citing *Gabor*, 2009 Bankr. LEXIS, at * 12 (citing *Weiss v. Alicea (In re Alicea)*, 230 B.R. 492, 500 (Bankr. S.D.N.Y. 1999))).
[297] *Hanson*, 432 B.R. at 772 (citing *Trizna v. Lepri & Malcolm (In re Malcolm)*, 145 B.R. 259, 263 (Bankr. N.D. Ill. 1992)).
[298] 11 U.S.C. § 523(a)(2)(A) (emphasis added).
[299] *Cadwell v. Joelson (In re Joelson)*, 427 F.3d 700, 704 (10th Cir. 2005).
[300] *Id.* at 705.

presents an overall picture of the debtor's financial position.  This interpretation limits statements 'respecting the debtor's . . . financial condition' to communications that purport to state the debtor's overall net worth, overall financial health, or equation of assets and liabilities.[301]

After an extensive examination of the text and structure of the Bankruptcy Code, the legislative history of § 523(a)(2)(A) and (B), and cases interpreting the phrase "respecting the debtor's . . . financial condition," the Tenth Circuit adopted the strict interpretation.[302]  The Tenth Circuit elaborated on its holding by precisely defining non-actionable statements under § 523(a)(2)(A) as "those that purport to present a picture of the debtor's [or insider's] overall financial health[,]" including  "those analogous to balance sheets, income statements, statements of changes in overall financial position, or income and debt statements that present the debtor or insider's net worth, overall financial health, or equation of assets and liabilities."[303]  Notably, the Tenth Circuit summarized that such statements–whether formally or informally made–must speak to the debtor's or insider's "overall net worth or overall income flow"[304] in order to fall outside the scope of § 523(a)(2)(A).  Thus, "[i]f a debtor's oral statements 'respecting [his or her] financial condition' later turn out to be false, debts obtained based on such statements can still be discharged under § 523(a)(2)(A)."[305]  Having now considered the Tenth Circuit's reasoning in *Joelson*, as well as that of the lower courts quoted and discussed therein, this Court is persuaded that the Tenth Circuit's holding is both logical and correct.  Accordingly, the Court will apply the strict interpretation in this and future cases.

### 3.    Actual Fraud

---

[301] *Id.* (citing *Skull Valley Band of Goshute Indians v. Chivers (In re Chivers)*, 275 B.R. 606, 614–15 (Bankr. D. Utah 2002)).
[302] *Id.* at 714.
[303] *Id.*
[304] *Id.*
[305] *Id.* at 707.

> Actual fraud as used in § 523(a)(2)(A) means common law fraud, provable by showing: (1) a representation made by [the] debtor to the creditor; (2)[the] debtor's knowledge of the falsity when the representation was made; (3) [the] debtor's intent to deceive in making such representation; (4) [the] creditor's justifiable reliance; and (5) [the] creditor's damage as a result.[306]

The term "actual fraud" is broadly defined to encompass "'any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another.'"[307]

### 4.    Common Elements to Any § 523(a)(2)(A) Cause of Action

Although false pretenses, false representation, and actual fraud represent differing concepts, the elements of scienter, reliance, and materiality are common to all and must by proven by a preponderance of the evidence in order for the creditor to prevail.[308]  Given how the record has developed in this case, the Court's analysis narrowly focuses on the first and second of these elements, both of which bear further discussion in their own right before they can be applied to the facts at hand.

First, "central to the concept of fraud is the existence of scienter which, for purposes of § 523(a)(2)(A), requires that it be shown that at the time the debt was incurred, there existed no intent on the part of the debtor to repay the obligation."[309]  "Proof of intent to deceive is measured by the debtor's subjective intention at the time the representation was made."[310] Because fraudulent intent is rarely admitted by a debtor, courts uniformly recognize that it may

---

[306] *Henderson*, 423 B.R. at 621 (citing *Gabor*, 2009 Bankr. LEXIS 3110, at *12 (citing *Dobrayel*, 287 B.R. at 12 n.3 (internal citation omitted))).

[307] *Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs.)*, 379 B.R. 5, 34 (Bankr. E.D.N.Y. 2007) (quoting *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000)).

[308] *Henderson*, 423 B.R. at 621 (citing *Cochran v. Reath (In re Reath)*, 368 B.R. 415, 422 (Bankr. D. N.J. 2006)).

[309] *Harrison*, 301 B.R. at 854 (citing *AT & T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 403 (5th Cir. 2001); *Binger v. Bloomfield*, 293 B.R. 148, 153 (Bankr. N.D. Ohio 2003)).

[310] *Hanson*, 432 B.R. at 772 (citing *Mega Marts, Inc. v. Trevisan (In re Trevisan)*, 300 B.R. 708, 717 (Bankr. E.D. Wis. 2003; *CFC Wireforms, Inc. v. Monroe (In re Monroe)*, 304 B.R. 349, 356 (Bankr. N.D. Ill. 2004)).

be established by circumstantial evidence or by inferences drawn from a course of conduct.[311]

Accordingly, the bankrupt's credibility is an important factor in finding or rejecting the same.[312]

Second, the Supreme Court has, in the context of a case involving the dischargeability of a commercial loan and personal guarantee, held that causation must be proven under § 523(a)(2)(A) by a showing of actual and justifiable reliance on the part of the objecting creditor.[313]    The creditor must, therefore, show that the debtor's fraudulent conduct was the "cause-in-fact of the debt that the creditor wants excepted from discharge."[314]    Assuming actual reliance is proven, the creditor must also show that such reliance was justifiable.    Under the justifiable reliance standard, which originates from New York common law fraud, "a person is justified in relying upon a representation of fact although he might have ascertained the falsity of the representation had he made an investigation" unless "under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, [in which case] he is required to make an investigation of his own."[315]    As the Supreme Court specifically observed, the justifiable reliance standard, while less demanding than the reasonable reliance standard formerly employed by some courts, does not render reasonableness irrelevant for the reason that:

> the greater the distance between the reliance claimed and the limits of the reasonable, the greater the doubt about reliance in fact.  Naifs may recover, at common law and in bankruptcy, but lots of creditors are not at all naïve.  The subjectiveness of justifiability cuts both ways, and reasonableness goes to the probability of actual reliance.[316]

---

[311] *Desiderio v. Parikh (In re Parikh)*, 456 B.R. 1, 34 (Bankr. E.D.N.Y. 2011) (citing *Dubrowsky*, 244 B.R. at 573–73); *accord In re Chase*, 372 B.R. at 129 (citing *Hong Kong Deposit & Guaranty Ltd. v. Shaheen (In re Shaheen)*, 111 B.R. 48, 53 (S.D.N.Y. 1990)).

[312] *In re Magnusson*, 14 B.R. 662, 669 (Bankr. N.D.N.Y. 1981) (citing cases).

[313] *Field v. Mans*, 516 U.S. 59, 74–75 (1995).

[314] *Hanson*, 432 B.R. at 773 (citing *Mayer v. Spanel Int'l Ltd. (In re Mayer)*, 51 F.3d 670, 676 (7th Cir. 1995)).

[315] *Field*, 516 U.S. at 70–72 (internal quotation marks and citations omitted).

[316] *Id.* at 76.

**C.      Signature's § 523(a)(2)(A) Claim**

Signature's request for relief under § 523(a)(2)(A) is predicated on false pretense, false representation, and actual fraud.   Generally, Signature alleges that Debtor made numerous fraudulent representations concerning the value of Signature's collateral, Debtor's financial condition, and the financial condition of the Ahava Companies and certain other insiders.[317] Signature further alleges that in the context of the parties' dealings, Debtor made additional fraudulent representations regarding his good faith efforts to secure additional financing, rehabilitate his collective businesses, and preserve and protect Signature's collateral and its liens encumbering the collateral.[318]   Specifically, Signature argues that Debtor made the following fraudulent misrepresentations, which are taken directly from Signature's proposed conclusions of law included in Plaintiff's Memorandum:

(a) certifying on Schedule 3.11 to the Credit Agreement that he and his brother co-owned AOC when, in reality, the Debtor sold his 50% ownership interest to his brother only one week prior to the execution of the Credit Agreement;

(b) in connection with due diligence for the Loan, representing to Signature that the AEG lawsuit was baseless and that he had repaid the money owed to AEG, where the Debtor later entered into a consensual stipulation of settlement with AEG agreeing to the entry of judgment against him and his companies in excess of $3.5 million;

(c) in connection with the Forbearance Agreement and First and Second Amendments thereto, failing to disclose transfers of assets to AOC, fail[ing] to disclose the sale of interests in Yoni, the delivery of false certification that [Debtor] was the sole member of Yoni and fail[ing] to disclose that [Debtor] no longer had a 50% interest in AOC (at the time of making transfers of encumbered collateral to AOC!)[; and][319]

(d) [representing in the Second Amendment] that no defaults other than those listed in the Forbearance Agreement and First Amendment . . . existed, [notwithstanding the] LCD lease to AOC . . . .[320]

---

[317] Discharageability Compl. ¶ 23.
[318] Dischargeability Compl. ¶ 23.
[319] Pl.'s Mem. at 36–37, 39.
[320] Pl.'s Mem. at 37.

As to intent, Signature contends that Debtor at all times intended to defraud Signature and, in the end, to orchestrate a "'bust-out' whereby he caused the transfer of [all] assets to AOC, with no payment or consideration to or consent from Signature."[321]   Based on the collective evidence, Signature asserts that it has proven by a preponderance of the evidence that Debtor acted with the requisite fraudulent intent during multiple transactions between the parties. Signature further contends that it did actually and justifiably rely on Debtor's fraudulent representations and conduct in agreeing to finance the Ahava Companies and eventually S&S.[322]

Debtor, on the other hand, raises three defenses to Signature's § 523(a)(2)(A) claim. First, Debtor argues that all of the statements complained of by Signature are non-actionable because they qualify as statements regarding Debtor or an insider's financial condition.[323] Applying the Court's earlier reasoning and conclusion to the facts at hand, however, the Court disagrees.   The Court's interest, therefore, lies with Debtor's remaining defenses.   Second, Debtor contends that the record as a whole is probative of good faith business dealings and his honest, albeit frustrated, efforts to repay the Loan and perform in accordance with the Credit Agreement, Forbearance Agreement, First Amendment, and Second Amendment.[324]   Even if an inference of fraudulent intent could be drawn, which Debtor disputes, he submits that the evidence in this case affirmatively negates any such finding.   Debtor argues that he has proven, among other things, that: (1) he worked diligently to find a buyer for the Ahava Companies and S&S so that he could repay Signature; (2) he arranged for certain of the businesses to borrow from AOC in order to "keep them afloat while he sought additional financing;" (3) he cooperated with Getzler and allowed Getzler "unfettered access" to the Ahava Companies and S&S; and (4)

---

[321] Pl.'s Mem. at 46.
[322] Pl.'s Mem. at 38–39.
[323] Debtor's Mem. at 26.
[324] Debtor's Mem. at 27.

all transactions involving the Ahava Companies, S&S, and AOC were done with the intent to preserve the value of Signature's collateral while also generating income for the Ahava Companies and S&S.[325]   Third, Debtor submits that the representations targeted by Signature were immaterial to Signature's business decisions to grant and extend the Loan and, thus, they were not relied on by Signature.[326]

As the Court's findings of fact reflect, it is evident that Debtor made certain false representations–either overtly or by omission–during the course of his relationship with Signature.   The first element of Signature's § 523(a)(2)(A) claim has therefore been met. Because Debtor has conceded this fact,[327] those representations need not be repeated here.

The decisive question then is whether Debtor made the false representations or engaged in a course of conduct with the requisite fraudulent intent to deceive or not to perform as required.   The Court rejects Signature's contention that the record is plain and probative in this respect.   Further, even if the Court were to draw a permissive inference from the totality of the circumstances presented, Debtor has come forward with sufficient credible testimony and evidence to convince the Court that he did not harbor an improper motive in his business dealings with Signature.

Preliminarily, the Court notes that in reaching this determination, it carefully considered all of the evidence, exhibits, and arguments of counsel, regardless of whether or not they are specifically referenced in this Memorandum-Decision and Order.   In applying a subjective standard for fraud in this case, however, the Court's ruling rests primarily on the following considerations that mitigate strongly against the existence of any fraudulent intent.

---

[325] Debtor's Mem. at 27.
[326] Debtor's Mem. at 28.
[327] Pl.'s Ex. 48; Banayan Dep. Tr. 83.

Debtor made payments on the Loan and remained current for approximately two years, during which time Signature executives described him as a "man of his word" who "lived up to his promises."  By Signature's own account, Debtor not only intended to pay the Loan at the time it was taken, but he in fact did so "innocuously" for a period of nearly two years, and he continued to make payments on the Loan thereafter up until he could no longer afford to do so. Moreover, it is undisputed that Debtor made good faith efforts as late as November or December 2007, if not beyond this time period, to secure additional or replacement financing in order to make Signature whole.  Bloch plainly conceded this point during his deposition when he testified that "there [was] a long history of [Debtor] . . . looking to reduce . . . [or] to take [Signature] . . . out."[328]   Even with the assistance and oversight of Getzler, Signature's selected turnaround management firm, Debtor was unable to resolve the debt issues that plagued the Ahava Companies and S&S, thereby eliminating any possibility of finding an entity to invest in, refinance, or purchase as a going concern the Ahava Companies or S&S.

Debtor's own testimony further mitigates against the existence of fraudulent intent.  In contrast to Bloch, whose testimony appeared to the Court to be carefully orchestrated and contrived and, at times, wholly inconsistent with the documentary evidence, Debtor presented as an honest, persuasive, and credible witness.  The Court, therefore, believes Debtor's testimony that he negotiated and entered into the Credit Agreement in good faith and that his end goals during the course of his relationship with Signature, through and including the time period encompassing the Forbearance Agreement, First Amendment, and Second Amendment, were to save his businesses from financial ruin and to reduce his personal liability to the maximum extent possible.

---

[328] Def.'s ZZZ, 2010 Bloch Dep. Tr. 158.

The Court's credibility assessment is supported by the following. Debtor successfully built and ran a multi-million dollar business empire for nearly twenty years. As a self-employed business owner and operator, Debtor was able to support his family, which includes Ana and their eight children.[329] It would stand to reason that Debtor would not intentionally or voluntarily jeopardize the financial health of his companies.

When it became clear that Debtor had lost control of the Ahava Companies and S&S, Debtor understandably sought to reduce his personal liability assumed in connection with these entities. While Signature points to the fact that Debtor settled the AEG Litigation by agreeing to the AEG Judgment, for example, as indicia of fraud, the more plausible explanation is that Debtor believed the $3,500,000.00 settlement was a safer bet than the potential for an $8,000,000.00 judgment, particularly in light of his inability to fund a complete defense at that time.

Similarly, Signature suggests that the Lease Agreements between AFC and LCD tend to prove that Debtor was operating under a "bust out" scheme. The record also fails to support this assertion. Rather, AOC's existence and the nature of its business as a kosher distributor were known to Signature from the beginning. Perhaps more critical to the Court's analysis is the fact that Signature was fully aware of AOC's involvement with certain of the Ahava Companies and S&S during 2007 while the parties were continuing to negotiate and enter into the Forbearance Agreement, First Amendment, and Second Amendment. While Signature now complains of a "bust out" scheme–a "scheme" to which it was in many respects an active participant, Debtor's actions are more consistent with his testimony that he "never intentionally misrepresented a significant fact or consciously misled Signature"[330] and that, in the end, he was "still hoping to

---

[329] Tr. 3 270.
[330] Pl.'s Ex. 48, 2010 Banayan Dep. Tr. 83.

somehow reach an agreement with Signature . . . and revive . . . the companies that he had been running for the last twenty years."[331]

In addition, the Court is simply not convinced that Signature actually or justifiably relied on the false statements made by Debtor.  Therefore, even if Debtor did act with the purpose and intent of deceiving Signature, the Debt would not be subject to the exception to discharge set forth in § 523(a)(2)(A).

Even assuming arguendo that Signature had proven Debtor's fraudulent intent, the record does not support a finding of reliance by Signature.  Rather, the Court is of the opinion that Signature routinely exercised poor business judgment, which in hindsight it seeks to attribute to fraud.  This theory of fraud by hindsight that Signature alleges is wholly supported by the record. For example, Bloch admitted that Signature reviewed tax returns showing that AOC had less than $400,000.00 in annual revenue for tax year 2005, causing Signature to conclude that AOC was not "deemed material enough of a company to be required" as a guarantor to the Credit Agreement."[332]  Moreover, Bloch confirmed that Signature did not rely on Debtor's fifty percent ownership interest when Signature made the Loan.[333]  Therefore, there was no reliance in fact on the very first statement identified by Signature in support of its § 523(a)(2)(A) claim.  The same can be said regarding the second statement identified by Signature in support of its § 523(a)(2)(A) claim.  When asked by Debtor's counsel during his deposition whether Bloch "was now claiming that AEG was never paid in full," Bloch replied, "I have no evidence to support that, but yes.  I *assume* that is the case."[334]  Bloch elaborated by stating, "if [Debtor] did not owe [AEG] anything, as he indicated and he represented to [Signature] up front, it does not

---

[331] Tr. 3 35.
[332] Def.'s ZZZ, 2010 Bloch Dep. Tr. 28–29.
[333] Def.'s ZZZ, 2010 Bloch Dep. Tr. 29.
[334] Def.'s ZZZ, 2010 Bloch Dep. Tr. 31 (emphasis added).

necessarily make sense to me that [Debtor] would consent to a judgment with [AEG] subsequently."[335]  Bloch reaffirmed this sentiment during trial.[336]  While assumptions certainly shift the blame from Signature, they do not win a case.

Finally, Signature now argues that Debtor intended to "perpetrate a fraud" on M&I. Bloch admitted during his deposition, however, that he and other Signature executives "made a collective decision . . . to open [bank] accounts for S&S . . . or another entity that was not a party to the [M&I Judgment], [to] allow [Debtor] to run funds through one of his other companies . . . ."[337]  Signature executives, including Bloch, "made a collective decision that it was better to have [S&S be] a party to the Credit Agreement and keep the cash funneling and running through [Signature], than to have it outside."[338]  Accordingly, Signature consciously sanctioned the very same actions that it now criticizes and targets as indicia of fraud.

Given the course of events that transpired between the parties, Signature's actions warrant the greatest scrutiny.  In the end, Bloch conceded that Signature made what amounted to a series of poor business decisions by continuing to extend credit in hopes that Debtor would successfully refinance or sell the Ahava Companies or S&S.  The continued financing of the Ahava Companies and S&S through more than $4,000,000.00 in overdrafts approved by Signature at the request of Getzler, in whom Signature put its full faith and credit to right the ship, ultimately failed.  Furthermore, rather than call the Loan in the face of multiple defaults, Signature instead chose to forbear.  In Bloch's own words, Signature "missed from a timing perspective."[339]

---

[335] Def.'s ZZZ, 2010 Bloch Dep. Tr. 34.
[336] Tr. 1 241.
[337] Def.'s ZZZ, 2010 Bloch Dep. Tr. 80.
[338] Def.'s ZZZ, 2010 Bloch Dep. Tr. 80.
[339] Tr. 2 at 52.

## VI.    CONCLUSION

In summary, the Court cannot find that Debtor acted with any wrongful intent in his dealings with Signature.  In addition, the Court is not convinced that Signature justifiably relied on false statements made by Debtor in connection with the Loan.  Therefore, the Debt is dischargeable.  As Signature has abandoned all claims properly before the Court other than that made under § 523(a)(2)(A), the Discharge and Dischargeability Complaints must be dismissed. Any personal liability that Debtor may have as a result of the State Court Judgment is therefore extinguished.

Accordingly, it is hereby

**ORDERED**, that the Discharge Complaint is dismissed; and it is further

**ORDERED**, that the Dischargeability Complaint is dismissed; and it is further

**ORDERED**, that a discharge shall be issued to Debtor.

Dated at Utica, New York
this 31st day of January 2012

/s/ *Diane Davis*
DIANE DAVIS
United States Bankruptcy Judge